PETER T. VALIULIS, Plaintiff, v. MILO SCHEFFELS, JR., *et al.*, Defendants (Steven Falls, Plaintiff-Appellee; The City of Rockford *et al.*, Defendants and Counterdefendants-Appellees; Peter T. Valiulis, Defendant and Counterplaintiff-Appellant).

Second District   No. 2—89—0085

Opinion filed December 4, 1989.—Rehearing denied January 17, 1990.

Richard K. Hunsaker and Douglas Pomatto, both of Heyl, Royster, Voelker & Allen, of Peoria (Karen L. Kendall, of counsel), for appellant.

Jerome Mirza & Associates, Ltd., of Chicago, and Lawrence J. Ferolie & Associates, Inc., of Rockford (Jerome Mirza, of counsel), for appellee Steven Falls.

Ronald N. Schultz, of City of Rockford Legal Department, of Rockford (Daniel J. McGrail, of counsel), for appellees City of Rockford and Milo Scheffels, Jr.

JUSTICE DUNN delivered the opinion of the court:

The litigation in the case at bar arose from a collision between an automobile driven by Peter Valiulis and a Rockford police car driven by Officer Milo Scheffels, Jr., on June 30, 1983. Steven Falls, a passenger in the Valiulis car, filed suit against Valiulis, Scheffels, and the City of Rockford (City). Valiulis filed suit against Scheffels and the City. The two cases were consolidated for a trial. The trial court entered a directed verdict in favor of Scheffels and the City in both cases, and the jury entered an award in favor of Falls and against Valiulis, in the amount of $2 million. Valiulis now appeals and raises the following issues: (1) whether certain testimony given by Dr. William Hovsepian, a clinical psychologist and neuropsychologist, was beyond the realm of his expertise; (2) whether Falls presented sufficient evidence for the jury to conclude that he suffered from multiple sclerosis at the time of the accident, and the resultant trauma caused the onset of the symptoms of the disease; (3) whether the trial court erred by allowing certain testimony from an economist concerning the average lifetime income of college graduates; and (4) whether the trial court erred by entering a directed verdict in favor of Scheffels and the City. We affirm.

Officer Scheffels testified that at the time of the accident he was on duty as a patrol officer for the Rockford police department. At about midnight on the day in question he was inside the Rockford Public Safety Building near the front desk when he received a silent alarm call from the West End Tap on the 1500 block of West State Street. Scheffels had previously responded to other silent alarms from the West End Tap in situations where fights, shootings, and armed robberies had taken place there. Scheffels did not know at the time he received the call what the nature of the trouble was; he only knew that someone at the bar had requested police assistance.

Scheffels went to his squad car and proceeded to drive to the tav-

ern, which was 11 or 12 blocks away. He activated the red lights on his squad car and the automatic siren. Scheffels testified that it had been raining that evening and the roads were wet. He believed it was still raining at the time he left in his squad car and that he put on his windshield wipers. Scheffels turned from Rockton Street onto West State Street. At that point, he turned off his siren in order to communicate by radio with an officer in another squad car that was responding to the same call. The other officer wanted to know Scheffels' location so they could arrive at the same time, in order to assure that neither would get into a difficult situation on his own. Arriving at the same time would also make it easier for the officers to block all exits and prevent a possible escape if a crime was in progress. Scheffels stopped talking to the other officer when he was about a block from the scene of the accident. He did not immediately reactivate his siren at this time because he was only five or six blocks from the West End Tap and did not wish to alert any potential perpetrators of crime inside that the police were approaching.

Scheffels was traveling westbound on West State Street. He saw a car that had been parked on the 1000 block of West State Street start to pull out in front of him. Scheffels testified that he was in the vicinity of a bridge across Kent Creek when this occurred, and the car, a Volkswagen Rabbit, was about 100 feet away when he first noticed it was pulling out. Scheffels applied his brakes and was not sure whether or not they locked. He swerved to the left into the eastbound lane in an effort to avoid colliding with the Rabbit. The Rabbit continued to pull out, however, and was apparently attempting to make a U-turn. The two cars collided in the eastbound lane of traffic. The front of the squad car hit the driver's side of the Rabbit. Scheffels stated that he attempted to reactivate his siren just before the impact.

According to Scheffels, he encountered no traffic on West State Street that night other than the Rabbit. Scheffels estimated that his maximum speed while traveling down West State Street was 40 to 45 miles per hour. He believed he was going about 30 to 35 miles per hour just before impact. Scheffels stated that from the point he turned onto West State Street, he had a clear view to the point of the collision.

Neither Valiulis, the driver of the Rabbit, nor Falls, the passenger, had any memory of the accident. A married couple, Mark and Tammy Burke, did witness the collision, however. They were both standing on a sidewalk about two or three blocks east of where the accident took place. Mark Burke testified that the squad car passed right by them. The car's emergency lights were flashing, but neither of the Burkes

heard a siren. Mark was not sure how fast the car was going, although he believed it was going over 30 miles per hour. Tammy was also not sure how fast it was going, although she stated it was going faster than the speed limit. She heard the sound of the engine accelerating as the squad car passed them.

Tammy admitted that on October 19, 1983, she signed a written statement in which she said the squad car may have been going as fast as 50 to 55 miles per hour. Mark acknowledged that during his deposition on January 15, 1985, he admitted signing a written statement in which he said the squad car was going at least 60 miles per hour. Mark testified further at trial that he saw no other cars moving down West State Street, and he saw the squad car move to the left as the Rabbit pulled out. Mark also thought the squad car was accelerating until the Rabbit pulled out. He testified further that it was a straight stretch down the street from the point where the squad car passed them to the point of the accident.

Marjorie Falls, Steven's mother, testified that he was in excellent health before the accident and that he was considered an excellent athlete in several sports. Steven suffered a fractured clavicle, a ruptured spleen, and a concussion in the collision. According to Marjorie, Steven was incoherent the first time she saw him after the accident and did not know who he was. Steven remained in the hospital from June 30 until July 8 or 9 and then stayed with his parents until the end of July.

Marjorie testified that in July 1983, Steven complained that the fingers on his left hand were tingling. His chest was also bothering him. Steven went to see Dr. Henry Anderson, the family physician, in October 1983, and Dr. Anderson advised him to see a neurologist if the problems persisted. Steven saw Dr. Sturnum, a neurologist, in November.

Around Thanksgiving time in 1983, Marjorie noticed that Steven had trouble getting up from a sitting position at the dinner table. In order to get up, he would spread his hands out on the table and push himself up until he was standing on tiptoes. At this point, his legs would quiver for a little while, and then he would be all right.

Although Steven was an accomplished skier, after he went skiing in January 1984, he told Marjorie that he had difficulty maintaining his balance. Steven graduated from Rock Valley College, a two-year college, during the summer of 1984. He began attending Illinois State University in the fall of 1984 and completed one semester there. When Steven returned home from school for Christmas that year, Marjorie noticed that his balance was very poor while he was walking.

Marjorie took him to see Dr. Terry Roth in January 1985 because of his continuing problems.

Steven returned to Illinois State for his second semester, but was forced to withdraw and return home in March 1985 because of his difficulties with balance and coordination. Marjorie testified that he was no longer able to ride a bicycle. In April 1985, he was diagnosed as having multiple sclerosis (MS). Since that time, Steven received treatment at the University of Chicago hospital.

Marjorie testified that Steven was currently able to walk short distances using crutches, but had to use a wheelchair most of the time. His arms and hands were very weak, and his hand coordination was poor. Steven tired very easily, and his speech was often slurred. During his initial hospitalization for MS, Steven temporarily lost his vision in one eye. When he became tired, he would sometimes suffer from double vision.

Marjorie also testified that in September 1983, her husband was diagnosed as having cancer of the colon, a terminal illness. She stated that this had caused a considerable amount of stress for the entire family, including Steven.

Some friends and acquaintances of Steven testified about some of the difficulties he was having after the accident. Ben Mosbach had known Steven for 24 years, since Steven was three years old. He often saw Steven at a swimming pool in Rockford. He testified that Steven appeared to be in excellent physical condition prior to the accident. Around November or December 1983, he noticed that Steven was no longer keeping his fingers together while swimming. He also noticed that Steven was no longer doing his flip-turns properly. Thomas Gobel, a friend of Steven's, noticed around Thanksgiving time in 1983 that Steven was having trouble with his hands while playing the guitar and that his rhythm and timing were off.

Dana Franklin dated Steven between 1979 and 1985. In July 1983, he was unable to tie his shoes, and the next month, he was no longer able to tie a tie. During the latter part of 1983 and early 1984, she noticed he was sometimes falling down stairs and running into things. Steven tended to hold onto objects in order to maintain his balance. His speech was somewhat slurred. These problems became more noticeable as time went on.

Dr. William Hovsepian testified on behalf of Steven. Dr. Hovsepian was a practicing clinical psychologist and neuropsychologist with a Ph.D. in clinical psychology from Loyola University. He completed his residency in these two areas at Michael Reese Hospital in 1980 and currently worked at Glendale Heights Hospital.

Dr. Hovsepian stated that clinical psychology is the diagnosis and treatment of various psychiatric disorders. Neuropsychology concerns itself with the differential diagnoses of neurological disorders in terms of their behavorial manifestations. Hovsepian stated that he was often called in for consultation when a psychologist or neurologist had a question as to whether symptoms were psychological, neurological or a combination. He was also called in when such symptoms were puzzling and there was a question as to the diagnosis. Hovsepian had evaluated approximately 150 patients who had multiple sclerosis. Hovsepian assisted in making the diagnosis of multiple sclerosis by administering certain tests to the patients. He testified that about 70% to 80% of the time, a patient with multiple sclerosis is initially misdiagnosed as suffering from some other problem.

Over the objection of Valiulis' attorney, Hovsepian gave certain general testimony concerning multiple sclerosis. He stated that the cause of the disease is unknown, although there were theories that it might be caused by a deficiency in the autoimmune system or might be caused by a virus. The term sclerosis was derived from the word sclera, which means patchiness. The term sclerosis refers to the fact that the nerve cells in the brain which are known as neurons are eaten away by the disease, leaving a patch or plaque. The disease causes a deterioration of brain cells and interrupts the transmission of impulses that make people think, move, talk, and so forth.

According to Dr. Hovsepian, multiple sclerosis can affect many different areas of the brain at once, and there is no way to predict which areas will be affected at any given time. He testified that sometimes the initial symptom is numbness in the arms or face. The disease is unpredictable; any combination of symptoms can present themselves at various times. Multiple sclerosis tends to cause patients to deteriorate over long periods of time until they die. Frequently, the deterioration is so complete that the patient is completely immobilized. This will cause a patient to reach a point where his or her lungs fill up with his or her own body fluids, resulting in death by strangulation.

Dr. Hovsepian first saw Steven when he came to Glendale Heights Hospital in December 1985 for a neuropsychological evaluation. Dr. Irving Sherman, a neuropsychologist at the University of Chicago hospital, had sent Steven to see Hovsepian. Hovsepian obtained a medical history from Steven and administered a series of tests known as the Luria Nebraska neuropsychological inventory, one of the two leading inventories for neuropsychological assessment. The inventory tests and assesses a number of functions, including the senses, memory,

motor coordination, speech, language, and reading. Dr. Hovsepian concluded from the results of the inventory that Steven was suffering from injuries to the brain resulting from the automobile accident and from multiple sclerosis.

Over the objection of Valiulis' attorney, Steven's attorney asked if Dr. Hovsepian believed there was a causal relationship between the trauma suffered by Steven in the collision. Hovsepian responded in the affirmative, stating that he believed the accident put the gears in motion for the multiple sclerosis symptoms to appear. The disease itself was not caused by the accident, according to Hovsepian, who testified that he believed Steven had a predisposition for it, and the trauma from the accident caused the multiple sclerosis symptoms to appear. He reached this conclusion because of Steven's clean medical history prior to the accident, the severe head trauma he suffered in the collision, and the onset of the MS symptoms shortly thereafter.

Dr. Hovsepian testified that he had seen at least 14 women with MS who, in his opinion, had the first symptoms of the disease triggered by the trauma suffered during their pregnancies. In another instance, Dr. Hovsepian believed that MS symptoms in a patient were triggered by head trauma suffered when the patient was hit by a car. That patient was in a coma for 28 days after his accident. Steven was never in a coma, although he did suffer a memory deficit and was unable to remember any events that occurred several days before and after the collision.

Since Dr. Hovsepian was not a physician, he was unable to base his opinion of the cause of the onset of Steven's MS symptoms upon a reasonable degree of medical certainty. He testified instead that his opinion was based upon his training and experience as a clinical psychologist and a neuropsychologist. In formulating his opinion, Hovsepian relied upon the medical history given to him by Steven and Marjorie Falls, as well as medical records provided to him by Dr. Sherman, including records of Steven's stay at SwedishAmerican Hospital following the accident.

Dr. Irving Sherman testified that he had been a board-certified neurologist since 1942 and was currently working at the University of Chicago hospital. He saw about 45 new patients per year who suffered from multiple sclerosis. Steven first saw Dr. Sherman on October 11, 1985. Steven told Dr. Sherman that he had been hospitalized after an automobile injury on June 30, 1985, and described the injuries he had suffered. Steven stated that when he left the hospital in July, his walk was unsteady and he experienced numbness in his left hand. About a month later, the numbness was persistent and he was

having trouble using the hand. Steven reported to Dr. Sherman that he subsequently had problems with coordination and with his right hand. Steven went away to school in 1984, but had to leave because he was unsteady on his feet and could no longer ride his bicycle to classes. In January 1985, Steven's walk was very unsteady, and he had to reach for walls when he was walking. Steven was diagnosed as having MS in April 1985.

Dr. Sherman stated that MS often manifests itself through numbness in the hands or other areas of the body. In his opinion, the numbness in Steven's left hand that appeared shortly after the accident was an early manifestation of multiple sclerosis. Steven's doctors had originally felt that the numbness was caused by an injury to the brachial plexus, the nerve center that supplies the arms, in the collision. Dr. Sherman testified, however, that he did not believe Steven had suffered a brachial plexus injury because there was nothing in the records he reviewed which indicated he had any motor disability, which usually occurs if there is a brachial plexus injury. Dr. Sherman felt that Steven had suffered a serious injury to his brain as a result of the accident. He also felt that the quivering in Steven's legs when he stood up at the dinner table may have been a symptom of MS.

In Dr. Sherman's opinion, there was a causal relationship between the trauma Steven suffered in the automobile accident and the onset of his MS symptoms. Dr. Sherman believed this was the case because of the close proximity in time between the accident and the onset of his neurological disability, and because Steven's history showed no MS symptoms prior to the collision.

According to Dr. Sherman, most of the literature on the subject suggested there was a relationship between trauma and the onset of MS symptoms in select cases. Dr. Sherman testified that he would be reluctant to attribute the onset of MS symptoms to trauma if the symptoms first manifested themselves over a year after the traumatic event. If the symptoms occurred within a month or even three to six months of the traumatic event, it was likely there was a causal relationship. Dr. Sherman stated that it was unusual for trauma to trigger MS symptoms. He had seen two cases other than Steven's in which he believed this had occurred.

Professor Charles Linke, an economist at the University of Illinois at Urbana-Champaign, testified on Steven's behalf. Linke testified over the objection of Valiulis' attorney that the present value of future earnings for the average male Illinois worker with Steven's age characteristics and a college education would be between $1,831,702 and $2,183,395.

Steven Falls testified that he noticed numbness and a tingling sensation in his left arm right after the accident. Steven graduated from Rock Valley College, a two-year college, in 1984, after attending part time since 1979. He received an associate of arts degree. He began attending Illinois State in the fall of 1984, and intended to complete his course of study for a business degree by the summer of 1986. Steven completed one semester at Illinois State but was forced to leave school during the middle of his second semester because of the MS symptoms.

At the time of trial, Steven was not working. His last job was a position as a house man at the Clock Tower Inn during the summer of 1984. Steven testified that he swam every day and usually felt very weak after he finished swimming.

Dr. Henry Anderson, one of Steven's treating physicians, testified on behalf of Valiulis. Dr. Anderson was the Falls' family physician. The first time he saw Steven after the accident was in the emergency room on June 30, 1983. Dr. Anderson did not note any damage to Steven's arms or legs at that time. Dr. Anderson also saw Steven on July 20, 1983, and August 4, 1983. Dr. Anderson's notes from these visits did not show any complaints by Steven of numbness or tingling in his left arm. Dr. Sturnum, a neurologist, saw Steven on November 25, 1983, and sent Dr. Anderson a letter that same day. The letter stated that Steven had complained of numbness and tingling in his left hand and problems fingering the strings of his guitar with that hand. Dr. Anderson stated that the letter indicated that Steven had reported to Dr. Sturnum that these symptoms had existed since the time of the collision. Dr. Sturnum diagnosed Steven as suffering from a brachial plexus injury.

Dr. Terry Roth, a neurologist who practices in Rockford, testified that he sees about six patients per year who have MS. Dr. Roth first saw Steven on January 11, 1985. Dr. Roth noted an increase in the reflex in Steven's left upper arm as opposed to the time Sturnum saw him. Dr. Roth felt this was consistent with a plexus injury.

Dr. Roth saw Steven again on April 15, 1985, and noted increasing numbness in his right hand and increasing difficulty with walking. He felt these symptoms were much more dramatic than they were in January. Dr. Roth felt Steven was suffering from the residual effects of a plexus injury.

Dr. Roth did not feel that trauma from the automobile accident caused the onset of Steven's MS symptoms, nor did he feel there was a causal relationship between trauma and MS. Dr. Roth admitted that during his deposition he stated he was sure he had seen a case where

he believed there was a connection between trauma and MS.

Dr. Barry Arnason testified that he was a practicing neurologist at the University of Chicago hospital and chairman of the neurology department at the university medical school. Dr. Arnason had been practicing medicine for over 30 years and had been board-certified in neurology since 1971.

Dr. Arnason mentioned a study in a Swiss medical journal in which it was discovered that 20% of the people who were found to have MS during their autopsies had no medical history of MS during their lifetimes. Dr. Arnason stated it was possible these people had subtle MS symptoms during their lifetimes, but they were apparently unaware that they had the disease. In Dr. Arnason's opinion, there was no causal relationship between trauma and multiple sclerosis.

According to Dr. Arnason, he saw Steven between 20 and 30 times, starting on October 30, 1985. Dr. Arnason felt it was probable that the numbness on Steven's left side was the initial clinical manifestation of MS and that the disease first declared itself in Steven in 1983. In Dr. Arnason's opinion, Steven could no longer work.

After the close of the evidence, the trial court granted a directed verdict in favor of Scheffels and the City of Rockford on the remaining counts of the Falls and Valiulis complaints, which alleged wilful and wanton conduct on the part of these defendants. The jury then returned a verdict in favor of Falls and against Valiulis in the amount of $2 million. Of this amount, $1,800,000 was for economic loss and $200,000 for noneconomic loss. The instant appeal then ensued.

Valiulis' first contention on appeal is that the trial court erred by permitting Steven's attorney to elicit from Dr. Hovsepian testimony concerning the onset and progression of MS and testimony concerning his opinion that the trauma Steven suffered in the collision caused the onset of the MS symptoms shortly thereafter. Valiulis contends that the above testimony was medical testimony and Hovsepian should not have been allowed to give it since he was not a licensed physician. We disagree.

■ The general rule is that the trial judge has broad discretion in determining whether a witness is qualified to testify as an expert. (*Robinson v. Greeley & Hansen* (1983), 114 Ill. App. 3d 720, 728.) In order to lay a proper foundation for expert testimony, a party must show that the expert has specialized knowledge or experience in the area about which the expert expresses his or her opinion. (*Robinson*, 114 Ill. App. 3d at 728.) The expert's knowledge may be based upon practical experience as well as scientific or academic training. 114 Ill. App. 3d at 728.

In support of his position, Valiulis cites *People v. Felton* (1975), 26 Ill. App. 3d 395, in which the court ruled that it was proper for the trial court to refuse to allow a psychologist to give an opinion concerning defendant's sanity because this was a medical matter. (*Felton*, 26 Ill. App. 3d at 400.) We note that *Felton* is no longer good law, however. A qualified clinical psychologist may now testify regarding his opinion about defendant's fitness to stand trial, sanity, or mental illness. (Ill. Rev. Stat. 1987, ch. 38, par. 1005—2—5; *People v. Free* (1983), 94 Ill. 2d 378, 412.) We do not find *Felton* to be persuasive authority in support of Valiulis' position.

In several cases, Illinois courts have held that it was not error for trial courts to permit testimony concerning medical matters by individuals who were not licensed physicians. (See *Greenberg v. Michael Reese Hospital* (1980), 83 Ill. 2d 282, 291-93 (proper for expert in radiation treatment to testify as to standard of care for X ray treatment by a hospital); *Nicholas v. City of Alton* (1982), 107 Ill. App. 3d 404, 407 (witness with Ph.D. in toxicology and pharmacology qualified to render expert opinion on causal connection between decedent's tear gas exposure and death); *Kinsey v. Kolber* (1982), 103 Ill. App. 3d 933, 953 (clinical psychologist qualified to testify that individual suffered brain damage in automobile accident); *Buckler v. Sinclair Refining Co.* (1966), 68 Ill. App. 2d 283, 293 (same holding as *Kinsey*).) These holdings indicate that the fact Dr. Hovsepian was not a licensed physician would not bar him from giving expert testimony concerning multiple sclerosis if he was otherwise qualified to do so.

■ The trial court did not abuse its discretion in determining Dr. Hovsepian was qualified to testify about multiple sclerosis and about his opinion concerning the causal connection between the trauma Steven suffered in the accident and the onset of his MS symptoms. In addition to his qualifications as a clinical psychologist and a neuropsychologist, Dr. Hovsepian had seen approximately 150 patients with MS and had been called upon in many instances by neurologists and psychologists to assist in the diagnosis of patients who turned out to have MS. In light of his professional credentials and his experience with MS patients, we believe Dr. Hovsepian was clearly qualified to give the expert testimony in question. Indeed, it would be somewhat anomalous to conclude that Dr. Hovsepian would not be qualified to testify about multiple sclerosis when the neurologists and psychologists who sought out his expertise and assistance in diagnosing the disease would most likely be qualified to do so. We therefore reject Valiulis' initial contention.

■ Valiulis next contends that Steven was not entitled to re-

cover because he failed to present sufficient evidence to show that he had multiple sclerosis at the time of the accident and the trauma from the accident caused an aggravation of his preexisting condition. We disagree. Dr. Hovsepian testified that, in his opinion, trauma from the accident caused the onset of Steven's MS symptoms. Dr. Hovsepian also testified that Steven must have had a predisposition for MS or had a latent form of the disease in his body at the time of the accident.

Steven also presented evidence that MS can exist in a person without having its symptoms declare themselves for a period of time or, in some cases, during the person's entire lifetime. Dr. Arnason, testifying on behalf of Valiulis, agreed this was the case and cited a Swiss study showing that 20% of the people found to have MS after autopsies were not aware during their lifetime that they suffered from the disease. The jury could have reasonably concluded from the above evidence that Steven had MS at the time of the collision and that the trauma triggered the appearance of MS symptoms shortly thereafter.

Furthermore, Steven's attorney asked Dr. Sherman if he had "an opinion based on a reasonable degree of medical certainty as to whether the trauma that [Steven] received in the automobile collision of June 30, 1983, triggered, precipitated, aggravated or set off" the symptoms of MS so that the disease was converted from a silent disease to one that had overt symptomology. Dr. Sherman responded in the affirmative. When Steven's attorney asked what that opinion was, Dr. Sherman responded as follows:

> "First of all, I don't think anybody could have made a diagnosis of multiple sclerosis in this man before, so there is no way anybody could say he had multiple sclerosis. In my judgment, the proximity of the onset of his neurological disability to the time of his injury and the appearance of what in retrospect was, obviously, neurologic dysfunction makes me feel there is a causal relationship between the injury he suffered and the development of multiple sclerosis. The question of whether the injury itself is the cause I think is a moot question because I think without the injury this would not have occurred. I say that because there is a good body of thought and the etiology among multiple sclerosis cases in which it is clear that trauma will initiate the appearance of clinical symptomology either for the first time or certainly in terms of aggravating a case of multiple sclerosis which was present."

Valiulis attaches great significance to the fact that Dr. Sherman

later testified that he did not know whether Steven had MS or a predisposition for the disease prior to the accident. In other Illinois cases where awards to parties claiming that trauma from accidents caused their MS symptoms to manifest themselves have been affirmed, the courts have stated that in situations where knowledge of a disease is limited, as is the case with MS, medical evidence concerning causation may not be unqualified and unequivocal. (See *Dixon v. Industrial Comm'n* (1975), 60 Ill. 2d 126, 131; *Robinson v. Chicago Transit Authority* (1979), 69 Ill. App. 3d 1003, 1009.) In a negligence action, the plaintiff must show that the defendant breached a duty owed to plaintiff, and by so doing, proximately caused plaintiff's injuries. *Comastro v. Village of Rosemont* (1984), 122 Ill. App. 3d 405, 407.

Valiulis does not contest that there was ample evidence he breached a duty owed to Steven. With regard to the question of whether Valiulis' negligence caused the onset of Steven's MS symptoms, Dr. Sherman testified that in his opinion, to a reasonable degree of medical certainty, there was a causal connection between the accident and the development of MS in Steven and, without the accident, the MS would not have occurred. This testimony was sufficient evidence that the negligence of Valiulis was the proximate cause of Steven's MS.

Valiulis next contends that the testimony of Professor Linke, the economist who testified on Steven's behalf, as to future economic loss, was impermissibly speculative. In *Singh v. Air Illinois, Inc.* (1988), 165 Ill. App. 3d 923, the court held that testimony from the same witness concerning decedent's future earning capacity based upon the earnings of the average male Illinois worker of decedent's age, education level, and life expectancy was properly admitted into evidence. (*Singh*, 165 Ill. App. 3d at 930.) In the case at bar, Linke gave similar testimony based in part upon the assumption that Steven would have finished college were it not for the accident.

Valiulis cites *Christou v. Arlington Park-Washington Park Race Tracks Corp.* (1982), 104 Ill. App. 3d 257, in support of his contention that Linke should not have been permitted to base his testimony upon the assumption that Steven would have completed college were it not for the collision. In *Christou*, the plaintiff was unemployed at the time of his accident but was in training for a position as a bartender. Plaintiff testified that before the accident he had hoped to own a restaurant some day. Over defendant's objection, the trial court allowed plaintiff to introduce testimony from a restaurant owner that the average restaurant showed a profit of $500 to $700 per week. The court held it improper to admit the restaurant owner's testimony, stating

that testimony as to lost earnings which is speculative or remote is improper and that recovery is limited to such loss as is reasonably certain to occur. *Christou,* 104 Ill. App. 3d at 260.

The case at bar is clearly distinguishable from *Christou.* Completing college was not a distant ambition of Steven's; he had already finished the equivalent of 2½ years of college. The jury could have reasonably concluded from the testimony of Steven and his mother that Steven would have completed college in 1986 had he not been stricken with multiple sclerosis. Professor Linke's testimony was properly admitted into evidence.

The final assertion raised by Valiulis is that the trial court erred by entering a directed verdict with regard to his allegations of wilful and wanton misconduct against Scheffels and the City of Rockford. Valiulis argues that the evidence presented concerning the squad car's speed and the failure of Scheffels to activate his siren was sufficient to present a question for the jury. We disagree.

■■ ■ In a jury trial, a directed verdict is appropriate only if the evidence when viewed in an aspect most favorable to the opponent so overwhelmingly favors the movant that no contrary verdict could stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510.) In an action for wilful and wanton misconduct, plaintiff must show that defendant intentionally caused his or her injury or exhibited a reckless disregard for the safety of others. (*Bosen v. City of Collinsville* (1987), 166 Ill. App. 3d 848, 850.) In a case involving an automobile accident, the latter would include demonstrating that defendant had notice that would alert a reasonable person that a substantial danger was involved but failed to take reasonable precautions under the circumstances. *Hering v. Hilton* (1958), 12 Ill. 2d 559, 564; *Kirshenbaum v. City of Chicago* (1976), 43 Ill. App. 3d 529, 533.

■■ It is clear from the evidence that Officer Scheffels, who swerved in an attempt to avoid the collision, did not intentionally cause the injuries to Valiulis or Falls. There was also no evidence that he exhibited a reckless disregard for the safety of others. The only evidence concerning the speed of the squad car is the testimony of Scheffels that he was going a maximum of 40 to 45 miles per hour, testimony from Tammy Burke that it was going over the speed limit and accelerating, and testimony from Mark Burke that it was going over 30 miles per hour. The prior, inconsistent statements from the Burkes indicating that the squad car may have been going as fast as 65 miles per hour were not admissible as substantive evidence. *Derrico v. Clark Equipment Co.* (1980), 91 Ill. App. 3d 4, 12.

Although the streets were wet at the time, the fact that Officer

Scheffels may have been traveling as fast as 45 miles per hour would not constitute wilful and wanton conduct in light of the fact that there was no other traffic, there is no evidence Scheffels ever lost control of the car, and the necessity for prompt arrival at a potential trouble site. Although the *Kirshenbaum* case indicates that a police officer's failure to activate a siren can constitute wilful and wanton conduct (*Kirshenbaum*, 43 Ill. App. 3d at 533-34), the facts of that case are distinguishable since the sun was directly behind a police car engaged in pursuit of another vehicle, potentially blinding other drivers (43 Ill. App. 3d at 533-34). In the case at bar, the evidence was undisputed that Valiulis would have had a clear view down West State Street for several blocks in the direction from which the squad car was approaching.

From the evidence presented, the first knowledge Officer Scheffels had that a substantial danger existed was when he saw the Rabbit begin to pull out. By applying his brakes and swerving to the left, Scheffels took reasonable precautions to avoid the impending collision. We agree with the trial court's conclusion that, as a matter of law, Officer Scheffels was not guilty of wilful and wanton conduct. The directed verdict was therefore proper.

■■ Finally, we take note that each of the appellees has moved for the dismissal of this appeal, alleging that the statement of facts in the appellant's initial brief did not fulfill the requirements of Supreme Court Rule 341(e)(6) (113 Ill. 2d R. 341(e)(6)). We agree that the appellant's statement of facts was not adequate in some respects but do not feel the drastic sanction of dismissal of the appeal is warranted. We have therefore resolved the issues raised on appeal by Valiulis.

The judgment of the circuit court of Winnebago County is affirmed.

Affirmed.

McLAREN and REINHARD, JJ., concur.