C.D.L., INC., n/k/a Cafe du Louvre, Inc., *et al.*, Plaintiffs-Appellees, v. EAST DUNDEE FIRE PROTECTION DISTRICT, Defendant-Appellant.

Second District   No. 2—92—0958

Opinion filed November 23, 1993.—Rehearing denied December 27, 1993.

Nicholas Scarpelli, Jay S. Judge, and Kristine A. Karlin, all of Judge & James, Ltd., of Park Ridge, for appellant.

Steven B. Fisher, of Kostow & Daar, P.C., and Rocco A. Romano, of Bruce Dorn & Associates, both of Chicago, and Patrick J. O'Shea, of Law Offices of Patrick J. O'Shea, of Lombard, for appellees.

JUSTICE WOODWARD delivered the opinion of the court:

Plaintiff, C.D.L., Inc., n/k/a Cafe Du Louvre, Inc., owned a building at 16 East Main Street in East Dundee. Plaintiff, John Granados, operated his Cha-Cha-Cha Mexican Restaurant in C.D.L.'s building.

At approximately 9:30 a.m. on February 1, 1990, a fire truck (Engine 44) owned and operated by defendant, East Dundee Fire Protection District, responded to an emergency call. While en route, Engine 44's brakes failed, causing it to crash into that portion of C.D.L.'s building in which Mr. Granados' restaurant was located. Subsequently, plaintiffs filed separate complaints sounding in negligence, which were eventually consolidated. The case was tried before a jury, which returned a $94,521.64 verdict in plaintiffs' favor. This timely appeal followed.

On appeal, defendant raises five issues, namely: (1) whether defendant was shielded from liability under section 5—106 of the Local Governmental and Governmental Employees Tort Immunity Act (Act) (Ill. Rev. Stat. 1989, ch. 85, par. 5—106); (2) whether plaintiff failed to prove defendant had actual or constructive notice of the defective brakes under section 3—102(a) of the Act (Ill. Rev. Stat. 1989, ch. 85, par. 3—102(a)), and defendant proved it had an inspection system which entitled it to immunity of section 3—102(b)(2) of the Act (Ill. Rev. Stat. 1989, ch. 85, par. 3—102(b)(2)); (3) whether various evidentiary rulings by the trial court were in error; (4) whether the trial court erred in allowing a mechanic to testify as an expert witness on fire truck inspections and to testify that his employer, American Airlines, conducted regular "tear-down" inspections on its trucks; and (5) whether the trial court erred in admitting evidence that the right front brake drum of Engine 44 leaked brake fluid one year prior to the instant accident.

Prior to discussing the facts of this case, it is useful to outline the important elements of its procedural history.

In October 1990, C.D.L., Inc., filed its complaint. In November 1990, John Granados filed his complaint. The two actions were consolidated.

In January 1991, defendant filed a motion to strike and dismiss plaintiffs' claims, asserting that plaintiffs failed to state a cause of action. Defendant asserted that, pursuant to section 5—106 of the Act, it could only be held liable for its willful and wanton conduct since, at the time of the crash, Engine 44 was responding to an emergency call. Since plaintiffs alleged mere negligence with regard to the inspection, maintenance and repair of Engine 44 (and since plaintiffs did not deny that Engine 44 was responding to an emergency call), defendant maintained that dismissal was in order.

Plaintiffs responded to defendant's motion to strike and dismiss, contending that section 5—106 of the Act concerned only a public entity's negligent operation of a motor vehicle, thus rendering section

5—106 inapplicable, since plaintiffs did not allege negligent operation, and that, in light of section 5—103 of the Act, defendant remained accountable for negligence by reason of the condition of its motor vehicle. On July 8, 1991, the trial court denied defendant's motion to strike and dismiss.

Subsequently, defendant filed an answer to the complaint and put forward an affirmative defense which referenced section 5—106 of the Act. Plaintiffs moved to strike all such references to section 5—106 and to strike defendant's affirmative defense. Plaintiffs' motion was granted in part and denied in part. All references to section 5—106 of the Act within defendant's answer were stricken. The trial court let defendant's affirmative defense stand. The trial court stated that plaintiffs should initiate some type of substantive motion, *i.e.*, a motion for summary judgment, prior to trial so as to finalize the issue of the defendant's tort immunity, or lack thereof, for purposes of appellate review. On December 20, 1991, plaintiffs filed a motion for partial summary judgment, arguing that defendant could not rely on a section 5—106 defense. On January 24, 1992, the trial court granted plaintiffs' motion for partial summary judgment and, on the same date, granted defendant leave to file an affirmative defense based upon section 3—102 of the Act. On January 22, 1992, defendant filed its response to plaintiffs' motion for summary judgment.

Prior to trial, plaintiffs filed a motion *in limine* to bar defendant from introducing or making any reference to the National Fire Protection Association standards regarding weekly inspection and preventive maintenance. Over defendant's objection and after considerable argument on the issue, the trial court granted plaintiffs' motion *in limine*. Defendant made no offer of proof on this issue.

At trial, the following evidence was adduced. Lieutenant Steven Hardy testified regarding the defendant's vehicle inspection system. At all relevant times, defendant had in place an established system which was to be followed by defendant's personnel. All vehicles underwent weekly checks, weekly road tests, and daily "rig checks."

Lieutenant Hardy also stated that defendant's five vehicles were thoroughly examined each week by the officer on duty, who inspected all of a vehicle's system. For example, all fluid levels, connections and tire pressures were checked. Headlights, turn signals and other accessories were tested. The inspection included a check for any fluid leaks. An extensive checklist was completed for each weekly inspection. Admitted into evidence were 52 checklists from weekly inspections of Engine 44 taken in the year prior to the subject accident. Weather permitting, defendant's vehicles were road tested once a

week. The road test normally lasted 15 minutes, wherein the vehicle was driven approximately six miles through the streets of East Dundee.

Chief Mark Rakow testified that the daily check is not a formal inspection, like the weekly check. An officer on duty checks to see that the vehicles are "plugged in" to their battery chargers and that the floodlights used in fire fighting are fully charged. He further stated, "You basically walk around [the vehicles] making sure that the Scott tanks, which are air tanks that you wear on your back, are there and ready to go. And again [you check to see that there are] no obvious leaks or things falling off the engine or whatnot."

On cross-examination, Chief Rakow admitted that defendant had no set procedure for periodically removing Engine 44's tires and inspecting its braking system. He further conceded that, in the 10-year period preceding the accident, Engine 44's braking system had never been examined. To his knowledge, Engine 44's braking system was comprised of parts originally installed when the vehicle was manufactured in 1968.

Evidence indicated that there was no set procedure regarding the *internal* inspection of Engine 44's brake system. In the 10-year period preceding the crash, Engine 44's brakes had never been dismantled and the component parts examined for failed or failing parts. Similarly, there was no general procedure where, on a periodic basis, department vehicles were taken in to repair facilities and overhauled.

According to Chief Rakow, Engine 44 was a fire truck with a Ford chassis. It was manufactured in the late 1960's. The distance between the fire station floor and the vehicle's underside is approximately 20 inches. At the time of the accident, there were about 16,000 miles on the vehicle's odometer.

Lieutenant Hardy testified that on January 29, 1990, he performed a "weekly check" of Engine 44. During this inspection, he went through the entire checklist. He found nothing wrong with Engine 44. Due to inclement weather that day, the vehicle's road test was postponed to the following day. On January 30, Lieutenant Hardy performed the usual road test on Engine 44. He noticed nothing wrong with the vehicle's brakes; they were neither "spongy" nor hard to work.

Between the January 30 road test and the morning of February 1, Engine 44 was not given an intensive inspection, nor was it used to respond to any emergency calls. Between the January 30 road test and the subject accident on February 1, prior to the subject accident, Lieutenant Hardy performed daily rig inspections on Engine 44, in-

cluding a rig inspection approximately two hours before the accident. He discovered no leaks or other problems.

At 9:30 a.m. on February 1, the defendant's fire station received an emergency call regarding a traffic accident, which involved possible entrapment of a person within a vehicle. Lieutenant Hardy drove defendant's ambulance to the accident scene.

Mark Guth testified that he was a fire fighter employed by defendant. At approximately 9:30 a.m., he received a summons on his beeper and immediately drove his car to the fire station. Fire fighter Guth put on his gear and climbed onto the driver's side of Engine 44's cab. Three other fire fighters boarded the vehicle, and Mr. Guth drove Engine 44 out of the fire station and made a left-hand turn onto Third Street. He then turned right onto Barrington Avenue and proceeded to North River Street. Making a right turn onto North River, Engine 44 proceeded south towards Route 72. As Engine 44 approached Route 72, Mr. Guth attempted to apply the brakes. When he did, the brake pedal went to the floor. He attempted to apply the emergency brakes, which did not function. Mr. Guth testified that Engine 44 experienced total brake failure. Immediately thereafter, it crashed into the Cha-Cha-Cha Mexican Restaurant located at 16 East Main Street.

After completing his work at the accident scene, Lieutenant Hardy returned to the fire station. Inspecting bay No. 2, where Engine 44 had been parked prior to the accident, he discovered a puddle of fluid on the floor, which was later determined to be composed in large part of brake fluid. Lieutenant Hardy testified that, if he had seen the puddle of fluid on the floor of bay No. 2 prior to the crash, he would not have ignored it. He would have investigated further to determine if there was a mechanical problem.

In response to defendant's motion, Randall Ballschmiede was "voir dired" outside the presence of the jury. Thereafter, the court allowed Mr. Ballschmiede to testify to the heavy equipment maintenance and inspection system employed by the American Airlines facility where he works, but not to render an opinion as to the adequacy of defendant's inspection system.

Mr. Ballschmiede, testifying on behalf of plaintiffs, stated that, although he was a sworn full-time patrolman for the East Dundee police department, he only worked for it on a part-time basis. His duties with the police department included inspections of the department's vehicles.

Mr. Ballschmiede testified that his primary employment was as a heavy equipment mechanic at American Airlines' O'Hare Airport fa-

cility. At the time of trial, he had been a mechanic for 11½ years, the last 4½ years with American Airlines at O'Hare Airport. As a heavy equipment mechanic, Mr. Ballschmiede had repaired breakdown-related failures and was involved in preventative maintenance of heavy equipment. He estimated that, as a mechanic, he had inspected, maintained and repaired hundreds of motor vehicles, including large heavy trucks. While working with American Airlines, he had occasion to inspect, maintain, and repair vehicles of the C series Ford chassis. American Airlines' O'Hare facility had about 30 of such vehicles, which were used to deice planes before takeoff. He described Engine 44 as a C series, Ford chassis, with a brake system comparable to those on which he regularly worked.

During his career, Mr. Ballschmiede was aware of 50 brake fluid cylinder failures, none of which involved a C series Ford chassis. He opined that the reason the C series trucks he worked with did not experience brake fluid malfunction was that the problem had always been caught by a mechanic before a vehicle became disabled. Mr. Ballschmiede stated that at American Airlines he performed regular "tear-downs" of heavy equipment. (The record is unclear whether these operations took place semiannually or biannually.) During the tear-downs, vehicles were taken apart, fully examined to ascertain that they were in safe operating condition and then put back together.

After the crash, the East Dundee village administrator requested that Mr. Ballschmiede examine Engine 44. He examined the vehicle at the village garage on February 2, 1990. Engine 44 was in essentially the same condition as it was immediately following the crash. He dismantled the left rear tire brake assembly, due to the fact that this part of the vehicle was positioned over the floor area where the brake fluid puddle was found. It appeared that the braking system was the original equipment installed in Engine 44, which was built in the late 1960's. Mr. Ballschmiede thoroughly examined the wheel cylinders and brake shoes. The brake shoes were in normal condition, in terms of their thickness. The upper and lower left rear wheel cylinders were leaking brake fluid. The lower wheel cylinder had come apart from the application of the brake prior to the accident and from deterioration. The upper cylinder had deteriorated to the point where it was leaking fluid.

Mr. Ballschmiede determined that the brake shoes were saturated with brake fluid. In his opinion, the brake fluid leakage had occurred prior to the subject accident. He also opined that to a reasonable degree of certainty it would take two to four days to saturate the brake shoes in such a fashion. He based this conclusion on the thickness of

the brake shoes, the amount of brake fluid that had soaked into the brake shoe linings and the overall wetness exhibited in that specific part of the vehicle's brake system.

Mr. Ballschmiede could not determine when the brake fluid actually began to leak into bay No. 2's floor. As he explained, a slight leak with a wheel cylinder could drip for some time yet remain within the brake drum, with the brake shoes acting as a "blotter." While it takes two to four days for the brake shoes to become saturated, the leakage onto the floor may take longer. Once the level of saturation of the brake shoes reaches a certain level, the leaking fluid will run down from the inner tire to the floor.

When asked what causes brake fluid to leak out of a hydraulic system such as was found in Engine 44, Mr. Ballschmiede stated that leakage occurs when there is a fault in the brake system, such as a wheel cylinder or a brake lining giving out. After such a breakdown occurs, the fluid leaks out of the sealed system. Deterioration, age or substantial use can cause a failure in the system. Once one part of the braking system fails, the entire system malfunctions.

■ Defendant initially argues that it is immune from liability under section 5—106 of the Act, which, it contends, prevails over section 5—103 of the Act. As discussed above, the trial court barred all references to section 5—106 during the trial. Defendant asserts that, reading the statutes *in pari materia*, section 5—106 is more specific than section 5—103 and, thus, is controlling.

In response, plaintiff maintains that the subject sections are consistent in both scope and effect. The Act contemplates two separate and distinct causes of action based upon each section. Plaintiff contends that section 5—103 concerns conduct which takes place prior to injury or damage to a third party, namely, in this failure to do, in advance, what was reasonable to discover a defect in a defective vehicle. Plaintiffs then characterize section 5—106 as concerning injury or damage which results from a fire department's improper use and/or handling of department vehicles or equipment while on the road or at an emergency scene.

Section 5—103(a) provides:

"Neither a local public entity, nor a public employee acting in the scope of his employment, is liable for an injury resulting from the condition of fire protection or firefighting equipment or facilities. Nothing in this section shall exonerate a public entity from liability for *negligence by reason of the condition of a motor vehicle* while it is traveling on public ways." (Emphasis added.) Ill. Rev. Stat. 1989, ch. 85, par. 5—103(a).

Section 5—106 provides:

"Except for willful and wanton conduct, neither a local public entity, nor a public employee acting within the scope of his employment, is liable for an injury caused by the *negligent operation* of a motor vehicle or firefighting or rescue equipment, when responding to an emergency call, including transportation of a person to a medical facility." (Emphasis added.) Ill. Rev. Stat. 1989, ch. 85, par. 5—106.

Courts will strive to find harmony between legislative acts so as to give effect to the legislature's intent. (*People v. Caraballo* (1992), 231 Ill. App. 3d 685.) When two legislative schemes do not seem completely compatible, they should be interpreted so that meaning and effect is given to each statute. *Stephens v. Cozadd* (1987), 159 Ill. App. 3d 452.

The crux of this issue is Engine 44's *mechanical condition* as it was being driven to an emergency scene on February 1, 1990. We have closely reviewed section 5—106 and do not find that it is at all relevant to the instant appeal. Section 5—106 clearly relates to *negligent operation*, as opposed to the condition, of fire fighting vehicles and/or equipment, which is not at issue here. Plaintiffs made no allegations regarding fire fighter Guth's operation of the vehicle on the subject morning. Rather, plaintiffs contended that defendant was negligent in failing to discover Engine 44's defective brake condition prior to its operation on February 1, 1990. The trial court did not err in ruling that section 5—106 of the Act was inapplicable to the case before us.

■ Defendants next contend that plaintiffs failed to prove that it had constructive notice of the defective condition pursuant to section 3—102 of the Act. (There is no dispute that defendant did not have actual notice of said condition.) Plaintiffs argue that the evidence supported the jury's determination that defendant had constructive notice of the leaking brake system.

Section 3—102 provides:

"Except as otherwise provided in this Article, a local public entity has the duty to exercise ordinary care to maintain its property in a reasonably safe condition for the use in the exercise of ordinary care of people whom the entity intended and permitted to use the property in a manner in which and at such times as it was reasonably foreseeable that it would be used, and shall not be liable for injury unless it is proven that it has actual or constructive notice of the existence of such a condition that is not reasonably safe in reasonably adequate time

prior to an injury to have taken measures to remedy or protect against such condition.

(b) A public entity does not have constructive notice of a condition of its property that it is not reasonably safe within the meaning of Section 3—102(a) if it establishes either:

(1) The existence of the condition and its character of not being reasonably safe would not have been discovered by an inspection system that was reasonably adequate considering the practicability and cost of inspection weighed against the likelihood and magnitude of the potential danger to which failure to inspect would give rise to inform the public entity whether the property was safe for the use or uses for which the public entity used or intended others to use the public property and for uses that the public entity actually knew others were making of the public property or adjacent property; or

(2) The public entity maintained and operated such an inspection system with due care and did not discover the condition." Ill. Rev. Stat. 1989, ch. 85, par. 3—102.

The burden of proving notice is on the party charging it. (*Burke v. Grillo* (1992), 227 Ill. App. 3d 9.) Constructive notice of an unsafe condition exists where said condition had existed for such a length of time or was so conspicuous or plainly visible that, through the exercise of reasonable care and due diligence, the public entity might have known of it. (*Burke*, 227 Ill. App. 3d at 18.) The question of whether defendant had constructive notice of Engine 44's unsafe brake system is one of fact for the jury. Unless the jury's verdict is unreasonable, arbitrary or not supported by the evidence, it should not be disturbed on review. (*Milwaukee Mutual Insurance Co. v. Wessels* (1983), 114 Ill. App. 3d 746.) A jury's verdict will not be set aside merely because the jury could have drawn different inferences and conclusions. *Coldwell Banker Residential Real Estate Services of Illinois, Inc. v. Jepsen* (1988), 172 Ill. App. 3d 662.

Regarding section 3—102(a), defendant argues that plaintiffs failed to put forward sufficient evidence that it should have made further inquiry into or inspection of the brake system. Consequently, defendant contends that it was immune from liability under section 3—102(a) because plaintiffs failed to prove constructive notice of a leaking brake cylinder.

In response, plaintiffs argue that, where a duty exists, the law requires that one make a diligent use of his senses and exercise a degree of care commensurate with the danger to be anticipated. Plaintiffs point out that section 3—102(a) specifically states that a public

entity has a duty to exercise ordinary care to maintain its property in a reasonably safe condition. Plaintiff asserts that defendant's conduct did not rise to such a level.

The evidence showed that Engine 44 was a relatively large vehicle with its underside standing 20 inches off the ground. Chief Rakow and Lieutenant Hardy testified that a person making a conscious effort could see underneath Engine 44. The evidence demonstrates that a person using a flashlight could have observed a growing puddle of fluid on the floor of bay No. 2 near the left rear tires, between the time it was taken out on January 30 for a test drive and the time it was taken out in response to the February 1 emergency call.

Obviously, the testimony regarding the amount of time that the fluid was likely dripping onto the floor and the relative ease by which such a puddle could have been observed swayed the jury. We will not overturn its decision regarding the issue of whether defendant had constructive notice of the leaking brakes.

The cases cited by defendants are so factually dissimilar to the appeal at bar as to provide this court with little useful guidance. For example, in *Burke v. Grillo* (1992), 227 Ill. App. 3d 9, plaintiff fell in a dip adjacent to a public sidewalk. She brought suit against her landlord and the City of Elgin. Both defendants filed motions for summary judgment. Elgin argued that it had no duty to maintain its property for pedestrians injured while walking on property outside of designated crosswalks or walkways. Elgin also maintained that it had no actual or constructive notice of defect as required by section 3—102(a) of the Act.

While the *Burke* court recognized that municipalities have a duty to maintain their property in a reasonably safe condition, it concluded that it was unnecessary to determine whether such a duty existed because plaintiff did not establish that Elgin had notice of the subject condition as required by section 3—102(a) of the Act.

In *Burke*, the condition which caused the accident was arguably one over which Elgin had no control. Here, there is no question that defendant had complete control over the operation of Engine 44. Moreover, the inspection system of the Elgin sidewalk, if indeed there was one, bears virtually no resemblance to the much more intensive inspection methods used in the appeal at bar. Given these dissimilarities in factual content, *Burke* proves to be of little instructive value.

■ Next, defendant contends that, pursuant to section 3—102(b)(2), it proved a lack of constructive notice of the defect by evidence of its inspection system which, though operated and maintained

in a reasonably adequate fashion, failed to discover the leaking brake system.

Plaintiff responds by arguing that the adequacy of the inspection system was not in dispute. Rather, it was the application of said system which proved inadequate. Plaintiffs maintain that if defendant had actually followed its own established inspection procedure, specifically the daily rig check, the condition would have been discovered and the February 1 accident averted.

The evidence indicates that after the road test on January 30, 1990, the floor beneath Engine 44 was not closely inspected prior to the February 1 emergency call. Lieutenant Hardy, who was primarily responsible for the daily checks, did not state that he inspected the floor beneath the vehicle with a flashlight to determine if it was leaking fluid of any kind. The evidence indicates that the daily checks were cursory and perfunctory to the point of not discovering a puddle of fluid beneath the left rear wheel. This evidence specifically conflicts with Chief Rakow's testimony that the daily inspections were intended to discover "obvious leaks."

The jury could have determined from the evidence before it that the condition was discoverable under the defendant's inspection system but that defendant failed adequately to employ said system. Based on this record, the jury's determination of this issue was not against the manifest weight of the evidence.

■ Next, defendant argues that the trial court made a number of erroneous rulings which were highly prejudicial to it. First, it contends that the court erred in holding that evidence of the National Fire Protection Association (NFPA) standards was inadmissible. During discovery, plaintiffs sought, through a production request, all records regarding Engine 44 and all procedures, manuals, policies, etc., upon which defendant relied. Defendant complied, furnishing, among other things, the weekly checklist inspection reports and other materials. Defendant did not have a copy of the NFPA standards and thus did not furnish them to plaintiffs with the production request. Subsequently, defense counsel became aware of the NFPA standards and learned defendant's inspection system complied with the NFPA standards. At that time, defense counsel advised plaintiffs' counsel of the NFPA standards and the intent to use them.

Prior to trial, plaintiffs filed a motion *in limine* to exclude any reference to NFPA standards. Plaintiffs argued that they were severely prejudiced by not receiving the NFPA standards until three days before trial.

In granting the motion *in limine*, the trial court stated:

"I do agree that [the NFPA standards] should have been disclosed. They were not disclosed and I'm going to, while I agree with you, Mr. Judge, that this would be relevant otherwise, they are not dispositive of negligence. They would bear on negligence but I think that under the circumstances here, fairness says you cannot refer to them. They should have been disclosed."

Defendants contend that this exclusion of the NFPA standards was highly prejudicial to its attempt to prove its inspection system was reasonable.

In contrast, plaintiffs assert that defendants were not prejudiced as a result of the trial court's prohibition. Plaintiffs further contend that even assuming *arguendo* that defendant was prejudiced by the exclusion, it failed to show the outcome would have been different if the evidence had been admitted. Finally, plaintiffs maintain that there was never an issue at trial as to what constituted the appropriate standard of care relative to the inspection of department vehicles.

The imposition of sanctions for the violation of discovery rules is a matter largely within the sound discretion of the trial court and will not be disturbed on review absent an abuse of discretion. *Paquet v. Steiner* (1993), 239 Ill. App. 3d 866, 869.

We do not find that the court below abused its discretion in granting plaintiffs' motion *in limine*. Defendant came forward with no compelling explanation as to why it failed to produce the NFPA standards to plaintiffs. Nor do we see how defendant was at all prejudiced by the exclusion of the NFPA standards, which were essentially reflected in defendant's inspection regimen. The introduction of the NFPA standard would have added little, if anything, to defendant's case.

Moreover, the deposition testimony of Lieutenant Hardy regarding NFPA standards vitiates defendant's argument. He was specifically asked by plaintiffs' counsel whether there were any provisions of NFPA or any other type of fire code, which concerned maintenance and inspection procedures. Lieutenant Hardy responded, "Not to my knowledge."

■ Defendant's next argument is that Randall Ballschmiede's testimony contained numerous improprieties. First, defendant contends that the trial court erred in allowing Mr. Ballschmiede to testify as an expert witness on fire truck inspections and to testify about "regular tear down" inspections of heavy equipment performed by his employer, American Airlines.

Defendant sought to bar Mr. Ballschmiede's testimony on the ground that he was not qualified as an expert either on fire truck inspections or on the frequency and nature of same. The trial court barred him from testifying about any industry standards on inspection systems or the adequacy of defendant's inspection system. However, the trial court permitted Mr. Ballschmiede to testify concerning the nature of heavy equipment inspections at American Airlines' O'Hare garage, where he was employed.

Defendant now maintains that, despite being barred from introducing testimony regarding industry standards, plaintiffs got into evidence which was barred, namely, evidence of the industry inspection standards, and Mr. Ballschmiede's opinion that a regular tear-down inspection of heavy equipment was needed.

Plaintiffs' response is that Mr. Ballschmiede did not offer a single opinion concerning the adequacy of defendant's inspection system. Plaintiffs admit that he did refer to American Airlines' mechanics' regular "tear downs" of heavy equipment. However, they insist that this is only a small piece of evidence in a long and complex trial and cannot be deemed so prejudicial as to warrant a new trial.

The record before us gives no indication that Mr. Ballschmiede gave any testimony on fire truck inspections. To be qualified as an expert, he had to be asked quite extensively about his experiences as a heavy equipment mechanic. This testimony can in no way be construed as serving to bring in evidence of an industry inspection system, which had been barred by the trial court.

Regarding Mr. Ballschmiede's reference to regular tear-down inspections, we find this issue is waived on appeal. Defendant failed to object to this testimony at trial. Generally, the failure to object to certain testimony at the time it is presented waives the objection for purposes of review. *Friedman v. Park District* (1986), 151 Ill. App. 3d 374, 383.

■ Next, defendant argues that it was improper for the jury to hear Mr. Ballschmiede's testimony about certain FAA regulations. Defendant asserts that permitting the jury to hear about these regulations was so prejudicial that defendant could not receive a fair trial. This argument is patently without merit.

A review of the record indicates that defendant, not plaintiffs, elicited testimony from Mr. Ballschmiede regarding FAA regulation. The following dialogue occurred during defense counsel's cross-examination of Mr. Ballschmiede:

"Q. [By Mr. Judge] American Airlines tells you what it wants to do on preventative maintenance and so forth, correct?

A. Yes.

Q. And then you do what they request you to do?

A. Correct.

Q. And American Airlines is subject to FAA rules and regulations?

A. Yes, they are.

Q. And are there some FAA regulations that govern you on what you deal with in terms of the mechanical work?

A. The general mechanic [*sic*], no. The field that I work in there are deicers that deice the aircraft. ***

* * *

Q. [T]hose *** [deicers] *** go out on the runways with the airplanes present?

A. Yes.

* * *

Q. And what you do is pursuant to the FAA regulations, which has certain requirements for vehicles next to airplanes, correct?

A. Yes.

* * *

Q. [A]ll the [a]irplanes, every certain number of miles, don't they tear 'em down, put 'em back together?

A. Yes.

Q. That's FAA regulations?

A. Yes, it is.

Q. And [s]ome of that brushes off on the trucks?

A. Yes."

Where a party introduces or elicits certain evidence, he cannot later complain about the introduction of it. (*Gillespie v. Chrysler Motors Corp.* (1990), 135 Ill. 2d 363, 374.) Here, defendant was the party eliciting testimony regarding FAA regulations. Consequently, it cannot now complain of such evidence being put before the jury.

■ Defendant further argues that the trial court improperly permitted Mr. Ballschmiede to testify relative to the leaking brake drum of Engine 44. At trial, he testified that, based on the amount of brake fluid he found saturated into the brake shoes, the brake fluid had leaked out of the brake drum prior to the accident. He estimated that the leak had started two to three days prior to the accident. Defendant also argues that Mr. Ballschmiede's testimony concerning the age of the left rear brake assembly was erroneously admitted into evidence. He testified that the brake assembly on Engine 44 appeared to be original equipment.

To lay a proper foundation for expert testimony, a party must show that the expert has specialized knowledge or experience in the area about which he or she expresses an opinion. (*Valiulis v. Scheffels* (1989), 191 Ill. App. 3d 775, 785.) The expert's knowledge can be based upon practical experience, as well as academic or scientific training. (*Valiulis*, 191 Ill. App. 3d at 785.) Whether a witness qualifies as an expert is within the sound discretion of the trial court. *In re Marriage of Olson* (1992), 223 Ill. App. 3d 636, 645.

Defendant's attempt to characterize Mr. Ballschmiede as primarily a part-time policeman whose testimony regarding the brake fluid on the brake shoes and the age of the brake system was beyond his expertise is not well taken. At the time of trial, he was an experienced heavy equipment mechanic who had worked extensively with C series Ford chassis vehicles.

Mr. Ballschmiede's testimony regarding how long the brake drum had been leaking was certainly within his expertise, which was gained from a number of years' experience working with hydraulic brake systems like that of Engine 44. Also, his testimony regarding the age of the brake system fell within his area of expertise, given his experience with C series Ford chassis hydraulic brake systems, presumably of varying ages. Accordingly, the trial court did not abuse its discretion in permitting Mr. Ballschmiede's testimony regarding these issues.

■ Defendant's final argument is that the trial court erred in admitting evidence that a front brake on Engine 44 had leaked and had been repaired one year before the subject accident. Defendant maintains that this evidence was irrelevant and extremely prejudicial to it. In response, plaintiffs contend that they introduced this evidence of prior brake fluid leakage to establish that defendant's inspection system worked, when followed.

The testimony regarding the prior incident of leakage was elicited from fire fighter Mark Guth. While being questioned by plaintiffs' counsel, Mr. Guth stated:

"Q. During the time you had been affiliated with the East Dundee Fire Protection District, were you aware of any other incidents of brake problems or brake leakage with regard to Engine No. 44?

MR. JUDGE: Objection, Your Honor. I believe we've discussed this.

THE COURT: Objection will be overruled.

BY MR. FISHER: Q. You can answer.

A. Yes.

Q. And that was—was that a situation of brake fluid leakage on Engine 44's brakes?

A. Yes.

Q. And was that incident of brake fluid leakage, was that detected by the department?

A. Yes."

Subsequently, Mr. Guth was questioned by defense counsel regarding the prior brake fluid leakage.

"Q. With respect to that loss of brake fluid on a previous occasion, again at the front tire, did that result in an automobile accident?

A. No.

Q. Was that somehow identified?

A. Yes, it was identified through their weekly checks.

Q. Do you know what happened after they identified the fluid leak to the front tire?

A. Yeah, the truck was placed out of service immediately and sent for repairs.

Q. After it was sent for repairs, did they experience any type of problem with that right front tire insofar as the braking system or fluid leak?

A. No problems after repairs.

Q. At least not to your knowledge?

A. Not to my knowledge.

Q. After it was determined that the right front tire had some type of fluid leak, was the vehicle at all used for any purpose before it was sent out for repair?

A. No.

Q. Was it taken out of service immediately?

A. Yes.

Q. And it was determined that it had some type of brake fluid leak by the weekly inspection?

A. I believe so, yes. I believe it was a weekly inspection."

The defendant contends that the above testimony regarding a fluid leak at the right front brake drum of Engine 44 was error. This prior brake fluid leak was discovered one year prior to February 1, 1990, as a result of the inspection system followed by defendant's employees. As noted above, a weekly inspection was made of Engine 44 and, further, a daily rig inspection was made by Lieutenant Hardy approximately two hours before Engine 44 was driven out of the fire station. Lieutenant Hardy's inspection failed to discover the puddle of brake fluid that was found on the floor after the subject accident.

The evidence of the fluid leak one year prior to the date of the accident in question was relevant to show that the inspection system used by defendant's personnel accomplished its purpose at that time, and Engine 44 was immediately removed from service until the right front brake drum was repaired. According to defendant's evidence, the same weekly and daily rig inspections were made before and on February 1, 1990, prior to the accident in question. Hence, the evidence of the prior brake leakage was proper, as it demonstrated the ability of the defendant's employees prior to and on February 1, 1990, to observe oil leakage on the floor under the 20-inch clearance under Engine 44 pursuant to the defendant's inspection systems in use at the time.

For reasons stated above, we affirm the circuit court's judgment.

Affirmed.

INGLIS, P.J., and QUETSCH, J., concur.