HARRY FORTNER, Plaintiff-Appellee, *v.* THOMAS McDERMOTT, JR., Defendant,—(RALPH WOLINSKI, Defendant-Appellant.)

(No. 70-168;

Second District—August 19, 1971.

Hinshaw, Culbertson, Moelmann, Hoban & Fuller, and George F. McNichols, of Wheaton, for appellants.

William J. Harte and Philip E. Howard, both of Chicago, for appellee.

Mr. JUSTICE ABRAHAMSON delivered the opinion of the court:

The plaintiff brought this action to recover for personal injuries sustained by him as the result of a three-car intersection collision. Plaintiff was eastbound on North Avenue, a four-lane through street with two lanes eastbound and two lanes westbound, and the defendant, Wolinski, was westbound on North Avenue in the city of Lombard. Defendant McDermott, age seventeen, was northbound on Grace Street which has a stop sign for Grace Street traffic at its intersection with North Avenue. McDermott proceeded to cross North Avenue in front of both plaintiff and Wolinski. There was a slight impact between the right rear of McDermott's car and the right front of Wolinski's car, after which Wolinski's car crossed the center lane of North Avenue and struck the plaintiff's car. A jury in the circuit court of Du Page County returned a verdict in the amount of $230,000 against both defendants, and judgment was entered thereon. After denial of Wolinski's post-trial motions, Wolinski alone appeals to this court.

Because the contentions of the appealing defendant involve the manifest weight of the evidence, it is necessary to set forth testimony presented in some detail.

About six o'clock on the morning of August 8, 1967, the plaintiff was driving his car eastbound on North Avenue in Lombard, and was proceeding in the inner eastbound lane. However, he has no recollection of anything which occurred within a block of the intersection of North Avenue and Grace Street. McDermott, when called as an adverse witness by the plaintiff, testified that at the time of the accident he was

northbound on Grace Street and on his way from his home to work. As he approached the intersection of Grace Street and North Avenue, he stopped at the stop sign, which was 15 feet south of North Avenue, looked once to his left and right, and then looking straight ahead proceeded into the intersection. He stated that when he looked, the traffic to his left or the eastbound traffic was about a block and a half away but he did not know how far the traffic to his right, the westbound traffic, was from him, although he did see a car approaching. He traveled through the intersection until he felt a bump. At that time his entire car, except for the last couple of feet, had proceeded through the intersection and was north of North Avenue. When he felt this bump, he heard no horn and no noise of brakes, but later heard a big crash. His speed was about 15 miles per hour when the bump occurred, but he did not know he was in an accident until he was stopped later several blocks north of North Avenue and informed that he was in an accident. After returning to the scene of the accident, plaintiff's car was in the eastbound center lane facing east, and the Wolinski car was very close to the plaintiff's car and was facing southwest while being one-half in the eastbound center lane and one-half in the westbound center lane. It was uncontradicted that the only damage to McDermott's car was a broken rear backup light on the right-hand side. Counsel for Wolinski asked no questions of McDermott.

Wolinski, also called as an adverse witness by the plaintiff, testified that the weather and visibility were good; that he was proceeding westbound on North Avenue in the traffic lane nearest the shoulder, which shoulder was wide enough to accommodate a car; and that one block from Grace Street he was going 50 miles an hour. He did not change his speed until the time of the collision. However, he saw the McDermott car two or three car lengths before the Grace Street intersection with North Avenue when it was 5 to 10 feet south of the stop sign, going 40 miles an hour. After he saw the McDermott car, he looked straight ahead. When he next saw the McDermott car, it was "shooting" across North Avenue and seemed to hesitate or slow down at the center lane and then speeded up to 40 miles an hour or better at the point of impact with his car.

Although Wolinski had testified as stated above, later in his testimony he stated that he tried to swerve around the back of McDermott's car when he saw that car shoot out; that he gradually applied his brakes when he was a couple of car lengths from the McDermott car, slowed down to about 40 miles an hour, and was actually in the inside lane at the time of the impact between his right front fender and the right rear of McDermott's car. He also stated that at the time of the accident the

front end of McDermott's car was at the north edge of North Avenue, and the rear end was coming past the middle of the two westbound lanes of North Avenue. On cross-examination, when confronted with his sworn deposition taken on a date close to the date of the accident, Wolinski admitted having previously stated that he did not apply his brakes until approximately three or four feet from the point of the impact with the McDermott car, and that his car was entirely in the outside lane at the time of that impact. The deposition also revealed that, when he first saw the McDermott car in the intersection, it was blocking the inside eastbound lane; that Wolinski was traveling 55 miles an hour when he first saw the McDermott car 40 feet away from the intersection; that he saw the McDermott car travel 30 feet before the impact; and that when he applied his brakes he was in the middle of the intersection. Wolinski also testified that after he collided with the McDermott car, he did not remember what happened. On deposition, however, after having stated that he was in the outside lane at the time of the accident, he said he thought he was in the lane he had been traveling in but did not know and he "couldn't get control" of his car. Counsel for Wolinski asked no questions of him, although there was a marked difference between his testimony and his deposition. The jury was presented with the question of the impeachment of Wolinski by his deposition.

Defendant Wolinski called Robert Hall as a witness. He testified that he was traveling eastbound on North Avenue in the outside lane and alongside of plaintiff's car, which was in the eastbound inner lane; that he saw McDermott's car about 50 feet from the intersection, and that although McDermott slowed a little bit as he approached the intersection, he did not stop but continued through the intersection. He further testified that McDermott's car was going 10 miles an hour when it passed the stop sign, speeded up to 15 miles an hour as it entered North Avenue, and when it got to the eastbound lane on the north side, a westbound car collided with it. McDermott's car was 50 feet from the intersection when the Wolinski car was 200 feet from the intersection. When McDermott's car passed in front of Hall, he was 100 to 150 feet away, but the Wolinski car was a little closer to the McDermott car. The collision between Wolinski and McDermott occurred at about the dividing line of the two westbound lanes on North Avenue. The Wolinski car bounced off the McDermott car, and proceeded west across the center line into plaintiff's car at a point of impact which was 50 to 75 feet from the prior collision. On cross-examination, Hall testified that the first collision was rather slight and that at the time of that impact the Wolinski car remained in the lane next to the north edge of North Avenue. After the collision between plaintiff and Wolinski, the plain-

tiff's car was 25 feet west of the intersection, straddling the two east-bound lanes, and the Wolinski car was across the center line, half in the westbound lane and half in the eastbound lane, facing in a southwest direction. He further stated that the Wolinski car was 200 feet east of the intersection when the McDermott car started to enter North Avenue and that he, Hall, observing the developing situation, took evasive action, and pulled off of North Avenue on his right-hand shoulder. He also testified that the Wolinski car slowed down 25 to 50 feet prior to the impact and reduced speed about 10 miles an hour from the 55 miles an hour it had been traveling. When confronted with his deposition taken nine days after the accident, Hall acknowledged that in his deposition he stated he could not estimate the speed of the Wolinski car prior to the accident other than to state it was moving at a fairly rapid speed; that he could not tell whether Wolinski took evasive action; and did not know if Wolinski changed the speed of his car prior to the accident. He had also stated on deposition that the impact between McDermott and Wolinski occurred five to six feet from the north edge of North Avenue.

A deputy sheriff, James Baker, who investigated the accident, was called as a witness by Wolinski. When Baker arrived at the scene of the accident, the plaintiff's car and Wolinski's car were in the inner east-bound lane. He said he found a small amount of debris in the inner westbound lane and 75 to 100 feet away he found debris where the Wolinski and plaintiff's cars were located after impact. Baker stated that he had determined the points of impact from the debris and, therefore, had determined that the first impact occurred in the inner westbound lane because of the debris in that lane. Cross-examination revealed that his report of the accident indicated the first impact occurred in the outer westbound lane and there was nothing in the report about location of debris in the westbound inside lane. Prior to testifying, Baker stated he had a conference with the attorney for Wolinski with reference to the point of the impact of the first accident.

Defendant Wolinski contends that the verdict is contrary to the manifest weight of the evidence and states that since he was on a preferential highway, for which McDermott was required to stop, he had the right to assume that McDermott would stop and that, therefore, there was no duty imposed upon him until McDermott entered the intersection. He states that once McDermott had entered the intersection, he slowed down and swerved and, therefore, did everything that could possibly be done to avoid the collision with McDermott. However, we are confronted with a situation of whether Wolinski and his witness, Hall, were effectively impeached in the minds of the jurors by statements made on their depositions which contradicted their testimony during trial. The

jury, under the circumstances here present, could very well have considered that portions of both Wolinski's and Hall's testimony were not credible in light of their previous statements in their depositions.

There is no question but what the collision between McDermott and Wolinski was slight and that the damage to the McDermott car was very little. In light of Wolinski's testimony that McDermott was going 40 miles an hour when he was 5 to 10 feet south of the stop sign, it would seem unlikely that Wolinski could expect McDermott to stop at the stop sign, although he states he has a right to assume that McDermott would stop. Also, it was certainly a question for the jury as to what Wolinski did upon seeing the McDermott car shooting across the intersection, where or when he applied his brakes, and whether he reduced his speed and changed lanes prior to the accident with McDermott. Wolinski did testify that he could not get control of his car at the time of the accident with McDermott. In *Sughero v. Jewel Tea Co.*, 37 Ill.2d 240, the plaintiff sought damages for personal injuries when his car collided with defendant's tractor unit operated by a Mr. Perrino. Perrino was proceeding in an opposite direction from the plaintiff when he skidded into plaintiff's lane of traffic. The court directed a verdict for the plaintiff on the issue of liability. In that case, the Supreme Court said in affirming the Appellate Court:

"A reading of the appellate court opinion shows that it did not hold skidding in and of itself constituted negligence. The rationale applied by the court was that after plaintiff had shown defendants' vehicle was on the wrong side of the highway and out of control, Perrino had the duty of showing it was there for some reason other than his own negligence."

Courts of review usually will not disturb a verdict of the jury as the jury is in a better position to determine the credibility of the witnesses and the proper weight to be given their testimony. (*Allen v. Yancy,* 57 Ill.App.2d 50, 55.) We cannot say that a conclusion opposite to that reached by the jury is required by the evidence or that the jury verdict is palpably erroneous and wholly unwarranted by the manifest weight of the evidence.

Defendant Wolinski also contends that he was prejudiced by improper argument of plaintiff's counsel and that those arguments constituted reversible error. Plaintiff's counsel, in his closing argument, stated:

"You may have noticed that when Dr. Markin and some of the other doctors were testifying—and right now when I have to discuss this problem I don't have Harry Fortner in the courtroom, because I don't want Harry to hear some of this.

"But I don't want you to think that he doesn't have an interest in what is going on here. I told him to wait out there."

Defendant Wolinski states that this is the same argument made in *Lange v. Coca-Cola Bottling Co. of Chicago*, 105 Ill.App.2d 99, and which was there held to constitute reversible error. In *Lange*, a Dr. Atlas, while testifying for the plaintiff as to the injury sustained by plaintiff, stated that he was reluctant to give an opinion as to the prognosis with the plaintiff's wife in the courtroom. Thereupon, the plaintiff's attorney asked the wife of the plaintiff to step out of the courtroom and she left the courtroom. The doctor then testified that the prognosis was extremely bad and that he estimated that the plaintiff's life expectancy was short and would be less than two or three years. Defendant's counsel made a motion to strike the answer as being based upon conjecture, and the answer was stricken. The court said in regard to the argument of plaintiff's counsel:

"He began his argument by saying:

'But in any event you may wonder where are the Langes at in a crucial stage in this case, and the answer to that is this—I don't have eyes watering in my nerves. Dr. Atlas preferred to have Mr. & Mrs. Lange out of the courtroom. So do I prefer to have these people not to be here this morning. So I took the liberty of calling the Langes last night and told them something unexpected came up that the court wouldn't start until about 2:30 this afternoon. So they would have plenty of time to hop on that 1:05 train.'

This argument was unwarranted particularly in view of the fact that the Doctor's estimated statement that plaintiff's life expectancy was short, less than two or three years, was stricken and was not in evidence. This statement could only be made to appeal to the sympathy of the jury and create passion and prejudice against the defendant."

■ The remarks of counsel, in our case, as to why the plaintiff was not in the courtroom was made by plaintiff's counsel, according to him, simply to assure the jury that the plaintiff had not lost interest in the case by his absence. In any event, there was no dramatic removal of the plaintiff from the courtroom in the presence of the jury as there was of the plaintiff's wife in the *Lange* case. In our case, the fact that plaintiff was not present in the courtroom certainly was apparent to everyone. There was no objection to his absence during the trial or objection to plaintiff's argument to the jury. Three doctors had testified as to the many injuries received by the plaintiff. The injuries were severe, and the issue of personal injuries was not a close question as it was in the *Lange* case. No medical testimony was offered by either of the defendants

nor was the extent of the injuries disputed by their counsel in their arguments to the jury. We do not conclude by the above statement made by counsel for the plaintiff and his argument to the jury were for the purpose of appealing to the sympathy of the jury and creating passion and prejudice against the defendant. Wolinski. Counsel for the plaintiff did not state why he did not want the plaintiff to hear his final argument. It is apparent, however, that the plaintiff knew of the extent of his injuries and the jury also heard evidence as to the injuries.

Wolinski also contends that the following argument of plaintiff's counsel was prejudicial and constituted reversible error:

"If your back is bad, if you have a bad day and it is not just the back, it is your whole day, your outlook on life and everything else is just miserable. It affects your whole life. It can't be limited.

If you can understand and appreciate what I am talking about—you have to consider the whole and how these injuries and the terrible pain this man has and will have in the future is going to affect his whole life and affect his outlook on life.

We could go out and get some hobo and we could say to him—he might not have any job or occupation or any money or any family or anything else and say to him, 'Look. I have got a proposition to put to you. I am going to make a contract with you that for the next 30 years I will give you $2,000 a year, and you don't have to do anything. Not at thing.'

Well, the hobo would be intrigued by that proposition and say, 'That sounds pretty good.'

'All you have to do is just get in his body and endure this pain for $2,000 a year. I will pay you for this pain.'

Now, I would suggest that whether that is adequate compensation, I don't know. I would suggest that $2,000 a year for the pain that he has and will undergo in the future is fair; $60,000 for the pain and suffering that he has and will have in the future."

It is said that argument caused the jury to identify with the plaintiff and thus makes subjective deliberations rather than objective deliberations to which the parties are entitled. In other words, it is said that the argument improperly asked the jury to put itself in the position of the plaintiff and, therefore, created reversible error. (*Brant v. Wabash Railroad Co.*, 31 Ill.App.2d 337.) In *Brant*, the court did hold that it was not proper to have the jury put itself in the position of the plaintiff. The court reversed the judgment for the plaintiff and remanded the case to the trial court for a new trial because of the cumulative effect of the remarks of plaintiff's attorney in closing argument, and said at p. 340:

"While we are reluctant to reverse on the basis of argument of coun-

sel, and are conscious of the fact that the greatest latitude should be permitted to an attorney in closing argument, within the discretion of the Trial Court (Walsh v. Chicago Rys. Co., 303 Ill. 339, 135 NE 709), it is apparent that the type of argument, *considered as a whole*, made in the instant case goes beyond the latitude which should normally be given to counsel under such circumstances (*Goad v. Grissom*, 324 Ill.App. 123, 57 NE2d 514)." *Emphasis added.*

In *Copeland v. Johnson*, 63 Ill.App.2d 361, 367, this court, in holding that the parties received a fair trial, stated:

"It is error for a plaintiffs' counsel to ask a jury to put itself in the position of a plaintiff, Thomas v. Illinois Power & Light Corp., 247 Ill. App. 378 (1928); Brant v. Wabash R. Co., 31 Ill. App. 2d 337, 176 NE2d 13 (1961). It is just as erroneous for a defense counsel to ask the jurors to place themselves in the position of a defendant. Had an objection been made, the court should have sustained the objection and instructed the jury to disregard the erroneous comments. However, no objection was made and we feel that the error was waived."

Page 368:

"Able counsel may prefer to permit slight error or informality of procedure or argument by opposing counsel to take place without objection in order to take advantage of it in his own argument. Having done so he may not later complain of the permitted error 'for the reason that an objection and the ensuing colloquy could serve only to emphasize the prejudice caused by the remarks' as stated in his briefs."

The counsel for the defendant, Wolinski, did not object to any part of the final argument of plaintiff's attorney. The final argument to the jury on behalf of Wolinski contains the following statement:

"I don't think that is inconceivable, and I ask you to consider your own experience, if you have ever driven by any of the shopping centers on Roosevelt Road or anywhere else and cars have pulled out in front of you.

"Suppose you tipped one of those cars and another car went another way. Are you at fault because someone said you should have been looking at that car all the while and you shouldn't observe any other traffic?"

Thus it appears that this case is similar to the *Copeland* case, and as to the point of law presently involved, the same conclusion must result here.

It is argued also by the defendant, Wolinski, that the plaintiff's argument to the jury hereinabove set forth, and mentioning "hobo" and certain amounts for pain and suffering, suggest a formula for determining

the amount of money for pain and suffering, although the use of such a formula in closing argument was held improper in *Caley v. Manicke,* 24 Ill.2d 390.

In *Warp v. Whitmore,* 123 Ill.App.2d 157, the court, in affirming judgments for the plaintiffs, said, p. 164:

"We are in agreement with defendant's position that arguments, which attempt to place before the jury a mathematical formula for arriving at damages for future pain and suffering based upon fixed units of time, are improper, (*Caley v. Manicke,* 24 Ill.2d 390, 182 NE2d 206; Jensen v. Elgin, J. & E. Ry. Co., 24 Ill.2d 383, 182 NE2d 211) but we are not here confronted with an argument of the nature as those in the cases cited by defendant.

"After arguing that one of the plaintiffs should be awarded a specific amount of damages for costs expended, lost work time, past pain and suffering, etc., her counsel suggested that she be allowed for future pain and suffering the sum of $100 per year for the number of years of her life expectancy. In making this argument, counsel carefully noted that the sums stated by him were only his suggestions, which could be high or low depending on what the jury determined to be just compensation.

"Secondly, no objection was made by the defendant at the time the argument was made to the jury. Finally, counsel for the plaintiff did not, as was the situation in the cases cited by the defendant, challenge defense counsel to offer a better 'scheme' for arriving at damages."

■ It is true that the plaintiff's attorney in final argument mentioned a figure of $2,000 a year for pain but it also is true that he said, "Now, I would suggest that whether that is adequate compensation, I don't know." It, therefore, appears that since no objection was made to the argument being discussed, and the argument contained only his suggestions together with his comment that he did not know whether his monetary suggestion was adequate or not, the decision in this case is controlled by the decision in the *Warp* case. Therefore, we find no reversible error in this regard.

Wolinski next argues that the jury verdict of $230,000 is excessive. He complains that the verdict is six times plaintiff's expenses, including estimated future expenses, but admits that there is no precise rule for fixing an award of damages in a personal injury action. He states that the excessive award was the result of passion and prejudice created by the improper argument by plaintiff's attorney and, therefore, must be set aside (*Swearinger v. Klinger,* 91 Ill.App.2d 251, 256). Wolinski states that plaintiff's lost income was $9,530; medical expenses, $5,666; estimated future medical expenses, $4,000; estimated future lost time,

$15,000; and the suggested figure of $60,000 for pain and suffering, making a total of $94,196. He calculates that the jury's verdict left $135,804 to compensate for disability and disfigurement, as they are the only items not included in the total of $94,196. His conclusion is, therefore, not only that the award was the result of passion and prejudice created by improper argument of plaintiff's attorney but also exceeded fair and reasonable compensation. In *Lau v. West Towns Bus Co.*, 16 Ill.2d 442, the court said, p. 453:

"* * * Each verdict for a personal injury must be examined in the light of the particular injury involved, with humble deference to the discretion of the jury in making its determination and to the ruling of the trial judge on the post-trial motions."

In *Barango v. Hedstrom Coal Co.*, 12 Ill.App.2d 118, the court said: "There is nothing in the record to indicate passion or prejudice on the part of the jury. The question before us is as to whether or not the total amount of the verdict falls within the necessarily flexible limits of fair and reasonable compensation or is so large as to shock the judicial conscience."

It must be noted that the evidence on the issue of damages was uncontradicted. Defendant Wolinski did not present any medical evidence and his counsel did not cross-examine as to the injuries as testified to by the doctors. Counsel for the plaintiff in final argument did suggest as fair compensation that the jury award the plaintiff "for the damages that he suffered: $229,196." Such a suggestion is proper. *Caley v. Manicke, supra*. In final argument, with reference to injuries, Wolinski's counsel stated:

"* * * I don't know how I can say any more but that I am very sorry that he has them, and will have them. You heard the doctors, the same as I did and probably have the same feelings I do about things. So you can imagine."

We will not go into the testimony of the doctors in detail. Dr. Markin testified that the plaintiff had a fracture at the base of the skull which also caused a leakage of clear fluid from the ear; that the X-rays revealed three rib fractures, some displacement of the ribs, and involvement of nerves in the chest area causing plaintiff pain. Dr. Huncke testified as to substantial limitation of motion in the right shoulder of the plaintiff; a fracture of the head of the right humerus; fracture to the hip and dislocation and requirement of future surgical procedures because of the dislocation; limitation of motion of the hip; thigh atrophy; and probable necessary surgery in the form of a hip fusion or the insertion of an Austin Moore prosthesis, which would require approximately $4,500 in medical expense and the loss of one year's employment. He also testified as to the

future debilitating condition even if the fusion or prosthesis were successful. Dr. Huncke further testified as to the right foot and ankle—that there were severe fractures and osteomyelitis. He recommended future surgery because of the pain which continues in the foot and ankle, but stated that any further surgery would be complicated by the osteomyelitis and that such complication could result in amputation of the foot. Even without surgery, the osteomyelitis could lead to amputation. Reconstructive surgery of the foot and ankle would have to wait for two and one-half years for quiescence of the osteomyelitis. Dr. Pokornowski testified that because of the trauma involved in the accident, the plaintiff suffered an extensive and acute anterior wall myocardial infarction of the heart; and permanent damage to the heart, reducing plaintiff's capacities for maximum cardiac output. The doctor also stated that he would have more likelihood of suffering a second heart attack and a lesser chance of surviving it.

■ Plaintiff was 43 years old at the time of the accident and in good health. Aside from the testimony of the various doctors, plaintiff stated that he was off to work for seven months because of the accident and then returned to work involving lighter tasks, but was still using a cane when he returned to work and up until the spring of 1969. He testified as to the persistent pain in the right upper part of his chest and in the area of the various fractures. He said there is no motion in his right foot; that it is painful for him to walk; and that he walks slowly, with a limp. He goes up and down stairs sideways, one step at a time, and has difficulty sleeping because of the pain. There is a continual draining from the wound (osteomyelitis) in his foot which requires treatment every evening. It is noted that the jury was instructed that neither sympathy nor prejudice should influence it, and that the verdict must be based on evidence and not upon speculation, guess or conjecture. It appears that, although Wolinski complains of a substantial amount being allowed by the jury for disability and disfigurement as well as for pain, those items are serious and substantial.

Having read the entire record, we conclude that the award was not the result of passion and prejudice created by improper argument of plaintiff's attorney or the co-defendant's attorney; that the verdict is not excessive in light of the particular injuries involved; and that the amount of the verdict is not so large as to shock the judicial conscience. We believe the total amount of the verdict falls within the limits of fair and reasonable compensation for the injuries as described by the doctors and the plaintiff.

Finally, it is contended that the trial court erred in not allowing further discovery on the issue of possible collusion between the plaintiff

and co-defendant McDermott. After verdict and judgment, and denial of Wolinski's post-trial motion, new counsel entered the case for Wolinski and filed a petition to vacate the denial of the post-trial motion. He also requested leave to amend the post-trial motion by adding the charge of collusion between plaintiff and co-defendant McDermott. The petition to vacate the order denying the post-trial motion, to amend the post-trial motion, and for leave to take various depositions states upon affidavit of the new attorney for Wolinski that he has information which tends to indicate that a settlement between the plaintiff and co-defendant McDermott was reached prior to judgment; that such a settlement agreement was prejudicial to the rights of the defendant, Wolinski, in that it created moot issues of liability and damages as to the co-defendant, McDermott; that after such a settlement, co-defendant McDermott had no standing before the court and arguments made in behalf of defendant McDermott were for the sole purpose of incriminating defendant Wolinski. The amendment sought to the post-trial motion of Wolinski stated that prior to final argument, an agreement existed between the plaintiff's attorney and the attorney for the co-defendant, McDermott, which insulated that defendant against a verdict in excess of $50,000; that the argument on the part of McDermott's attorney was for the purpose of incriminating defendant Wolinski and increasing the amount of the award to plaintiff, all of which was to the prejudice of defendant Wolinski and a fraud upon the court. Wolinski points out that counsel for McDermott in his final argument stated that the plaintiff was horribly injured and that he would not take a "million dollars" for his injuries; that State Farm Mutual, insurer of McDermott, tendered a draft to plaintiff's attorney of $50,000, the policy limits, after the trial. It is noted that neither McDermott nor State Farm Mutual seek to appeal the trial court judgment.

Plaintiff states that he was not aware of the mental processes for the attorney for McDermott, and is not responsible for the alleged tactics employed by McDermott's attorney. It is clear that both McDermott's attorney and the attorney for the plaintiff deny any collusion or agreement such as alleged by Wolinski. McDermott's attorney made it known to Wolinski and his attorney that he was going "to hold Wolinski in as a codefendant." McDermott's attorney states that he had concluded that McDermott at least was contributorily negligent, and because of the extent of the injuries it was advisable to attempt to hold Wolinski in the case also to attempt to cut down a judgment in excess of State Farm Mutual's insurance limits. It appears that prior to the verdict, State Farm Mutual on McDermott's behalf had offered $42,500 but that Wolinski's insurance company never offered over $1000. The attorney for the

plaintiff had made it clear that he would not settle the case for less than both policy limits. State Farm Mutual, therefore, had concluded that the case could not be settled even if it offered its entire policy limits because of the unreasonable attitude of Wolinski's insurer. Counsel for McDermott explained his remark to the jury about his not taking a million dollars for plaintiff's injuries by stating that he felt that if he were not completely open and above board with the jury and did not give them his own personal feelings honestly, they would "clobber me."

Depositions were taken of State Farm Mutual's representative, Brian Gardner, and the State Farm Mutual file was produced along with depositions.

The judge made an "in camera" inspection of the State Farm Mutual entire file which apparently was approximately four inches thick. The judgment concluded, after oral arguments by the attorneys and after examining the depositions and the State Farm Mutual file, that there was nothing to arouse suspicion that an agreement existed between the plaintiff's attorney and the attorney for McDermott. Therefore, the judge denied the post-trial motions and the motion for further discovery, and concluded that there was no fraud or collusion.

■ Having examined the record carefully for evidence of collusion, we conclude that the trial judge properly decided that there was no collusion between plaintiff and McDermott or their attorneys, and properly denied further discovery.

The judgment of the circuit court of Du Page County is affirmed.

Judgment affirmed.

SEIDENFELD and GUILD, JJ., concur.