BELEN RAMIREZ, Plaintiff-Appellee, v. THE CITY OF CHICAGO, Defendant-Appellant.

First District (4th Division)   No. 1—99—3736

Opinion filed December 7, 2000.

Mara S. Georges, Corporation Counsel, of Chicago (Lawrence Rosenthal, Benna Ruth Solomon, and Jane Elinor Notz, Assistant Corporation Counsel, of counsel), for appellant.

Steinberg, Polacek & Goodman, of Chicago (Ronald Kalish, of counsel), for appellee.

JUSTICE HOFFMAN delivered the opinion of the court:
The defendant, City of Chicago, appeals from a $234,227 judgment

entered on a jury verdict in favor of the plaintiff, Belen Ramirez, in the instant negligence action. The defendant contends that the trial court erred in directing a verdict on the issue of constructive notice, that it erred in allowing certain medical testimony, and that numerous improper remarks made by the plaintiff's counsel during closing arguments entitle it to a new trial. For the reasons that follow, we affirm the trial court's judgment as to the issue of liability, reverse as to the issue of damages, and remand for a new trial as to damages only.

On September 25, 1993, the plaintiff and her husband went to Dr. Fernando Cinta's office, located at 2012 South Ashland Avenue in Chicago. As the plaintiff was walking from their car to Dr. Cinta's office, she fell and injured her knee. The plaintiff sustained a knee fracture and subsequently underwent surgery and physical therapy. On September 7, 1994, the plaintiff and her husband filed a two-count complaint against the defendant. In count I, the plaintiff sought damages for her injury, alleging that the defendant had negligently maintained the sidewalk on which she fell. In count II, her husband, Felipe Ramirez, sought damages for loss of consortium. On October 20, 1998, the trial court entered an order stating: "Felipe Ramirez is dismissed with prejudice. The case shall continue as to Belen Ramirez." Also on that date, the trial court entered an order declaring a mistrial in the first trial of this case, citing as the reason that the plaintiff had presented certain evidence in violation of a court order. The evidence at the second trial was as follows.

The plaintiff and her husband both testified with the assistance of an interpreter. Mr. Ramirez testified that he did not see his wife fall. After the fall, when he asked her what had happened, she responded "I tripped and I fell." At the emergency room, Mr. Ramirez spoke, in English, to a receptionist, telling her that his wife had slipped and fallen. He testified that, at that time, he did not know the difference between the English words "slip" and "trip." He further testified he had never had any formal training in the English language but later acknowledged that he reads newspapers printed in English and sometimes speaks English at work. Mr. Ramirez also testified that, following the accident, he went to the police station and filed a report. He told the police that his wife had tripped and fallen.

Mr. Ramirez testified that, although he usually parked in Dr. Cinta's parking lot, he had parked on the street before. On the occasions that he did so, he walked on the sidewalk to get to the doctor's office. When asked if, prior to his wife's accident, he had ever informed the defendant that there was a problem with the sidewalk, he responded "No, no. I did not have a reason to do so." Mr. Ramirez acknowledged that it was drizzling when his wife fell and that the sidewalk was wet.

The plaintiff testified that, as she walked toward Dr. Cinta's office carrying her six-month-old daughter, she tripped on the uneven sidewalk, fell to her knees, and laid down over her heels. When asked if she had slipped, the plaintiff answered: "Of course I slipped. After I tripped and after I lost my balance I was not able to hold myself up. Yes, I did slip and fall after I tripped." According to the plaintiff, when her husband asked her what happened, she told him that she tripped, she slipped, and she fell. The plaintiff testified that she thought it was wet on the day of her fall but that she could not remember too well.

The plaintiff further testified that she had been going to Dr. Cinta's office for 10 years, both for her own appointments and for those of her children. She never had any problem walking on any area of the sidewalk in front of Dr. Cinta's office. When asked if she had ever complained to anyone regarding the condition of the sidewalk prior to her fall, she responded: "No. Because I did not live in that neighborhood."

The evidence deposition of Dr. Fernando Cinta was read to the jury. Dr. Cinta was shown photographs of the sidewalk area just to the north of the entrance to his office. In the photograph, Dr. Cinta identified an area where the sidewalk was uneven, estimating the difference in elevation of the two sidewalk slabs as "[m]aybe a couple of inches." Dr. Cinta testified that the sidewalk was in that condition when he began his practice at that location in 1977.

Dr. Cinta testified that both an emergency room triage report and the emergency room doctor's report stated that the plaintiff slipped. He further testified that the physical therapists' initial report stated that the plaintiff slipped on a wet sidewalk.

After the plaintiff rested, the defendant presented the testimony of Carmen Santana, subpoena clerk for St. Mary's Hospital, in order to establish that the plaintiff's hospital records had been prepared in the ordinary course of business. The defendant then published the following medical records to the jury: the emergency room triage report, the emergency room doctor's report, and the physical therapists' initial evaluation, all of which were referred to in Dr. Cinta's testimony; and several reports of Dr. Farahvar, the doctor who performed the plaintiff's surgery, one of which states that the plaintiff reported having fallen on a wet sidewalk.

At the close of evidence, the trial court entered a directed verdict in the plaintiff's favor on the question of whether the defendant had constructive notice of the condition of the sidewalk. The jury returned a verdict in favor of the plaintiff and awarded her $234,227, allocated as follows: $143,300 for past pain and suffering, $67,500 for loss of normal life, $4,000 for disfigurement, and $19,427 for medical expen-

ses. The trial court entered judgment on the verdict. Following the trial court's denial of its motion for a new trial, the defendant filed the instant appeal.

■ The defendant first argues that the trial court erred in granting a directed verdict in the plaintiff's favor with respect to the issue of notice. It is well settled that the trial court should enter a directed verdict only if "all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors [the] movant that no contrary verdict based on that evidence could ever stand." *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510, 229 N.E.2d 504 (1967). This is also the standard that we apply in reviewing the trial court's ruling on a motion for directed verdict. *Asplund v. Silica Sand Transport, Inc.*, 254 Ill. App. 3d 593, 597, 627 N.E.2d 117 (1993).

■ As to liability for injuries on the property of a local public entity, such as the defendant, section 3—102 of the Local Governmental and Governmental Employees Tort Immunity Act provides, *inter alia*, that a local public entity "shall not be liable for injury unless it is proven that it has actual or constructive notice of the existence of such a condition that is not reasonably safe in reasonably adequate time prior to an injury to have taken measures to remedy or protect against such condition." 745 ILCS 10/3—102 (West 1998)). The plaintiff presented no evidence that the defendant had actual notice of the uneven condition of the sidewalk on which she fell. Consequently, we must determine whether there was any triable issue of fact on the question of the defendant's constructive notice of the defect in its sidewalk upon which the plaintiff tripped.

■ Although the question of whether constructive notice exists is normally one of fact, it becomes a question of law which may be determined by the court if all of the evidence, when viewed in the light most favorable to the defendant public entity, so overwhelmingly favors the plaintiff that no contrary verdict could stand. *Pinto v. DeMunnick*, 168 Ill. App. 3d 771, 774, 523 N.E.2d 47 (1988). Constructive notice of a condition is said to exist where the condition has existed for such a length of time or is so conspicuous or plainly visible that the public entity should have known of its existence by exercising reasonable care and diligence. *C.D.L., Inc. v. East Dundee Fire Protection District*, 252 Ill. App. 3d 835, 844, 624 N.E.2d 5 (1993); see also *Finley v. Mercer County*, 172 Ill. App. 3d 30, 33, 526 N.E.2d 635 (1988); *Palermo v. City of Chicago Heights*, 2 Ill. App. 3d 1004, 1008-09, 276 N.E.2d 470 (1971).

In the instant case, Dr. Cinta testified that the sidewalk slabs in the area where the plaintiff fell were separated by a height of "[m]aybe a couple of inches." He further testified that the sidewalk had been in

this uneven condition since he started his practice in its current location in 1977, some 16 years prior to the plaintiff's fall. The record also contains several pictures of the relevant portion of sidewalk.

The defendant contends Dr. Cinta's testimony as to how long the uneven condition had existed was equivocal and that he acknowledged that his answer was merely a guess. For this reason, it contends, the doctor's testimony cannot be said to support a directed verdict. We disagree.

Dr. Cinta's testimony with regard to the length of time the uneven condition of the sidewalk existed was as follows:

"Q. How long has that condition been like that, based on your observations?

A. Many, many years. I don't know.

Q. Can you give the ladies and gentlemen of the jury an estimate as to how long that sidewalk has appeared in that condition as it appears in that photograph?

A. I don't know. More than the time that I've been here, I guess. I paved the entrance when I paved in my parking area.

* * *

Q. Now, was it in that condition when you began your practice at this location?

A. Yes.

Q. And what year was that?

A. 1977."

Viewing Dr. Cinta's testimony in the light most favorable to the defendant, as we must, we cannot say that Dr. Cinta's testimony that the condition had existed since he began his practice in 1977 was equivocal. Rather, any uncertainty or equivocation is directed toward the question of how long the condition had existed prior to that time.

The defendant further argues that a directed verdict in the plaintiff's favor was precluded by the testimony of the plaintiff and her husband that they had parked on the street in front of Dr. Cinta's office in the past and had never experienced a problem with the sidewalk. The defendant argues that, viewing this evidence in the light most favorable to it, it may be inferred that neither the plaintiff nor her husband had noticed the uneven condition of the sidewalk during their previous visits to Dr. Cinta's office. In support of its argument that this testimony was sufficient to preclude directed verdict on the issue of constructive notice, the defendant relies on *DiMarco v. City of Chicago*, 278 Ill. App. 3d 318, 662 N.E.2d 525 (1996).

The plaintiff in *DiMarco* sued the City of Chicago seeking to recover damages for injuries she sustained when she tripped and fell on a section of a curb that was raised two inches higher than the rest of

the curb. *DiMarco*, 278 Ill. App. 3d at 320. On appeal, the plaintiff argued that the jury's finding, in response to a special interrogatory, that the city did not have constructive notice of the defective curb was against the manifest weight of the evidence. The *DiMarco* court found that there was sufficient evidence to support the jury's finding, noting that, although the defect had existed for 8 to 11 years, neither the plaintiff nor her husband had ever noticed it. *DiMarco*, 278 Ill. App. 3d at 325-26.

We do not believe that *DiMarco* is dispositive of the issue before us. The defendant contends that here, as in *DiMarco*, neither the plaintiff nor her husband had previously noticed the injury-causing condition. We note that the opinion in *DiMarco* does not indicate how often or under what circumstances the plaintiff and her husband had previously encountered the curb. In this case, the plaintiff and her husband both testified that they had visited Dr. Cinta's office on many occasions in the past. They sometimes parked in Dr. Cinta's parking lot and sometimes parked on the street. The plaintiff was asked if she ever had any problem walking on any area of the sidewalk in front of Dr. Cinta's office prior to the date of her accident. She replied that she had not. She also testified that she did not complain to anyone about the condition of the sidewalk prior to her accident because she did not live in that neighborhood. The plaintiff's husband was asked if, prior to the plaintiff's accident, he had ever informed the defendant about a problem with the sidewalk near Dr. Cinta's office. He replied that he had not had a reason to do so. However, we find this testimony to be of little significance to the issue of constructive notice as it does not establish, as the defendant suggests, that the plaintiff and her husband had ever encountered the area of the sidewalk at issue prior to the event giving rise to this litigation.[1]

The trial testimony and exhibits established that the entrance to Dr. Cinta's office was located to the south of his parking lot entrance, while the area of sidewalk where the plaintiff fell was located to the north of the lot entrance. Therefore, on the occasions when the plaintiff and her husband parked in the parking lot, they would not have encountered the area in question while walking to the doctor's office. Furthermore, there was no testimony as to whether, on the occasions when they had parked on the street, they ever parked to the

---

[1]The defendant has waived any contention that the trial court erred in refusing to allow it to ask the plaintiff whether she had ever noticed any problem which she considered dangerous in the area of the sidewalk where she fell. The defendant mentions this only by way of a footnote to its brief and cites no authority in support thereof. 177 Ill. 2d R. 341(e)(7).

north of the parking lot entrance, thereby requiring them to walk over the area of sidewalk in question.

■ Finally, the defendant asserts that a directed verdict on the notice issue was improper because the defect in question is only "[m]aybe a couple of inches" in size, making it less likely that a reasonable person would have noticed it. In support of this argument, it notes that Illinois courts have, on a number of occasions, determined sidewalk defects of less than two inches to be not actionable, leading one court to suggest that a defect is not actionable unless it approaches two inches. See *Hartung v. Maple Investment & Development Corp.*, 243 Ill. App. 3d 811, 814-15, 612 N.E.2d 885 (1993); *Birck v. City of Quincy*, 241 Ill. App. 3d 119, 122, 608 N.E.2d 920 (1993) (and the cases cited therein). The defendant does not assert that the defect here was not large enough to be actionable but does contend that it is "barely actionable" and that, accordingly, it cannot be stated that, as a matter of law, it should have noticed the small defect. We disagree. It is well settled that there is no bright line test for determining the point at which a defect becomes actionable; rather, each case must be examined on its particular facts. *Warner v. City of Chicago*, 72 Ill. 2d 100, 104, 378 N.E.2d 502 (1978). We decline to adopt a bright line test as to the point at which a party can or cannot be said, as a matter of law, to have constructive notice of a defect. We believe, rather, that each case must be decided on its own particular facts.

■ Examining the facts in the instant case, we agree with the trial court that the evidence concerning the notice issue so overwhelmingly favored the plaintiff as to warrant a directed verdict in her favor with respect to that issue. There was uncontradicted testimony the defect had existed since 1977. As to the conspicuous nature of the defect, the record contains not only Dr. Cinta's testimony that the defect was "[m]aybe a couple of inches in size," but also several photographs of the defect, all of which dispel the notion that any finding that the defendant did not have constructive notice of the defect could ever stand.

■ We will next address the defendant's argument that it is entitled to a new trial on the basis of improper comments made by the plaintiff's counsel during closing arguments. Among the comments to which the defendant objects are a number of references to its failure to call certain witnesses. The defendant complains that the plaintiff's counsel commented several times that it presented written medical records stating that the plaintiff claimed to have slipped, rather than tripped, but that it did not call the medical personnel who had prepared those records to testify. The defendant, however, did not object to these comments and, accordingly, any objection thereto is waived. *Diaz v. Kelley*, 275 Ill. App. 3d 1058, 1072, 657 N.E.2d 657 (1995).

■ The defendant also complains that the plaintiff's counsel commented, both during his closing argument and again during rebuttal, upon its failure to call as witnesses the police officers to whom Mr. Ramirez gave a report following his wife's accident. During rebuttal, counsel stated that the presumption arising from this failure was that the officer's testimony was not favorable to the defendant. The trial court overruled the defendant's objection during closing argument and sustained its objection on rebuttal. We agree with the defendant that these comments constituted error, as it is improper for a party to comment upon the opposing party's failure to call a certain witness where the witness is equally available to both parties. *Fettson v. James*, 298 Ill. App. 3d 77, 85, 697 N.E.2d 1131 (1997). Improper comments during closing argument, however, require reversal only where the comments resulted in substantial prejudice to the challenging party. *Magna Trust Co. v. Illinois Central R.R. Co.*, 313 Ill. App. 3d 375, 396, 728 N.E.2d 797 (2000). The defendant contends that the counsel's comments imply that it did not call the officers as witnesses because their testimony would not have been favorable to it, *i.e.*, the officers would have testified that Mr. Ramirez told them the plaintiff tripped rather than that she slipped. According to the defendant, this was particularly damaging as its position at trial was that the plaintiff slipped on the wet sidewalk. We cannot say, however, that the defendant was substantially prejudiced. There were numerous medical records in evidence stating that the plaintiff had reported slipping, rather than tripping. Furthermore, Mr. Ramirez testified that, at the time of the accident, he did not understand the difference between the English words slip and trip, and he acknowledged having told at least one person, a receptionist at the emergency room, that his wife slipped. We also note that, although the trial court overruled the defendant's first objection to comments on this subject, it sustained the defendant's objection during rebuttal argument. Accordingly, counsel's comments regarding the defendant's failure to call the police officers do not mandate a reversal.

The remainder of the comments to which the defendant objects pertain to the issue of damages. Among these is counsel's suggestion to the jury that it should award damages on a *per diem* basis. Our analysis of this issue necessitates that we set forth the following portion of the closing argument by the plaintiff's counsel, in which he discussed the pain and suffering element of damages:

> "If you think about what it is to be pain free—we've all been to the dentist I hope and we've all had work done. If any of you have had a tooth pulled, let's suppose that I said to you, I have a dentist for you, and he will pull your tooth. And he will do it for $5 but he won't use any Novocaine.

Then I said to you or how about a dentist who will pull your tooth, he will use Novocaine but he's going to charge you $15. I suggest to you that all of you, most likely, would spend the extra $10 to be free of pain during that procedure. That's a way to figure out and think in your head what is it worth to us, what is the value to us to be pain free.

That's only for an hour or so of being pain free. ***

\* \* \*

How much is fair to compensate [the plaintiff] for her pain? Numbers I put down, as Judge Banks said to you, are just numbers. They are a range. They are what we think that [the plaintiff] has suffered through these four and a half years.

If you will look back at what we said, you'd spend for being pain free at the dentist office is $10 for an hour. Remember [the plaintiff] has had pain for every day.

If you'd multiply that times every day and you run that through for four and a half years, that's a number—

DEFENSE COUNSEL: Objection, your Honor.

THE COURT: He can argue about pain between the date of the accident and today.

PLAINTIFF'S COUNSEL: Let's say with one hour worth of pain to be pain free for $10, maybe a $100 to be pain free for a day. For four and a half years [the plaintiff] has had that pain.

I would suggest to you a number of $145,000 for those four years that [the plaintiff] has had the pain in her knee. The pain has not gone away. The pain that a doctor has said they can do nothing for."

■ In *Caley v. Manicke*, 24 Ill. 2d 390, 182 N.E.2d 206 (1962), our supreme court held that, although it is permissible for counsel to suggest to the jury, during closing argument, a total sum to compensate for pain and suffering, it is improper for counsel to suggest a mathematical formula, such as an award of a specific sum per day, to calculate those damages. The court held that the suggestion of such a formula "produces an illusion of certainty" and that "a formula, rather than encouraging reasonable and practical consideration, would tend to discourage such consideration." *Caley*, 24 Ill. 2d at 393. In that case, counsel had suggested to the jury that it award the plaintiff the following damages for pain and suffering: $1 per hour for the first 2 years following her injury, a total of 11,680 hours after deducting 8 hours per day for sleeping; $10 per day thereafter until the time of trial, a total of 510 days; and $1 per day for the remainder of the plaintiff's life expectancy, 8,760 days. *Caley v. Manicke*, 29 Ill. App. 2d 323, 334, 173 N.E.2d 209 (1961). The supreme court reversed and remanded the case for a new trial because of the argument. *Caley*, 24 Ill. 2d at 395.

In *Jensen v. Elgin, Joliet & Eastern Ry. Co.*, 24 Ill. 2d 383, 386-87, 182 N.E.2d 211 (1962), issued the same day as *Caley*, our supreme court, citing *Caley*, found it was reversible error for counsel to argue to the jury an hourly rate of compensation for the first year following the plaintiff's injury and a daily rate of compensation for the second year. The *Jensen* court reversed for a new trial as to damages only.

The defendant argues that the plaintiff's counsel suggested to the jury just the type of mathematical *per diem* formula which the *Caley* court ruled impermissible. We agree.

In *Caley*, our supreme court announced the rule that it is error for counsel to suggest to the jury that it calculate damages for pain and suffering based on a mathematical formula by which a specific sum is awarded per day or other fixed unit of time. *Caley*, 24 Ill. 2d at 391-94. In this case, counsel for the plaintiff suggested to the jury that it award the plaintiff $10 per hour or $100 per day from the date of her injury to the date of trial for her pain and suffering. We are perplexed by the plaintiff's assertion that "counsel did not use any kind of mathematical formula to arrive at an award for pain and suffering, but instead merely suggested that the jury should consider compensating plaintiff for her pain and suffering *every day* from the date of accident to the time of trial, which would be arrived at by multiplying the days in a single year by 4-1/2 years." Multiplication of a sum certain by a specified number of days is precisely the type of mathematical formula *Caley* forbade.

▪ In arguing that the comments in question do not fall within the scope of the rule announced in *Caley*, the plaintiff relies on *Watson v. City of Chicago*, 124 Ill. App. 3d 348, 464 N.E.2d 1100 (1984). Her reliance is misplaced. In *Watson*, the plaintiff's counsel suggested to the jury that it award the plaintiff $49,000 for 49 years of suffering. Counsel then stated: "If you were to be told that you are going to get $1,000 to take Tylenol once a year and to take—," at which point defense counsel objected and the plaintiff's counsel abandoned this line of argument. *Watson*, 124 Ill. App. 3d at 350. The *Watson* court found that, although it appeared that counsel had been about to make a *per diem* argument, he had abandoned that argument. The court held that a request for a lump sum of $49,000 for 49 years did not involve a mathematical argument and did not violate the rule set forth in *Caley*. *Watson*, 124 Ill. App. 3d at 351-52. We agree. As stated above, the court in *Caley* found that it is permissible for trial counsel to suggest a lump-sum amount for pain and suffering damages. In the instant case, however, unlike in *Watson*, counsel for the plaintiff did not merely suggest a lump-sum amount of damages but also suggested a per-hour and per-day amount.

The plaintiff also relies on *Allison v. Stalter*, 251 Ill. App. 3d 127, 621 N.E.2d 977 (1993), in support of her argument that her counsel's comments did not constitute an improper *per diem* argument. In *Allison*, the plaintiff's attorney suggested to the jury that it award her $5,000 per year for pain and suffering from the date of her accident to the time of trial and $600 per year for the remainder of her life expectancy to compensate for future pain and suffering. The *Allison* court found that the argument was not prohibited by *Caley*, noting, in part, that the comments in question covered only 1.5 pages in a 25-page closing argument and that the trial court had instructed the jury that it could not arrive at a damage award merely by multiplication. *Allison*, 251 Ill. App. 3d at 129-30. In this case, the comments in question occupy little more than 1 page in a closing argument which, including rebuttal, is 32 pages in length.

We disagree with the *Allison* court's holding that the argument involved therein is not prohibited by *Caley*. The court in *Caley* stated that the question presented for its determination was "whether the scope of proper jury argument permits the use of a mathematical formula from which counsel may argue that his client should be awarded a specific sum per day, *or other fixed unit of time*, for pain and suffering." (Emphasis added.) *Caley*, 24 Ill. 2d at 391. Counsel in *Allison* suggested to the jury an award of a specific sum per year. It is clear to us that the argument was prohibited by *Caley*. In reaching its conclusion that the argument did not constitute error, the *Allison* court noted that the argument occupied only 1.5 pages in a 25-page closing argument and that the trial court had admonished the jury not to calculate damages simply by multiplication. We fail to see how either of these factors is relevant to a determination as to whether the comments in question constitute error. We acknowledge that the trial court's admonishment to the jury may have affected the impact of the *per diem* argument on the jury. As such, we believe it is a factor that may be taken into account in determining whether the improper argument caused any prejudice but not in determining whether the argument constituted error in the first place. As to the number of pages the argument occupies in the record, we not only find the comparative length of the argument to be irrelevant to the question of whether an argument constitutes error, we find it to be of marginal relevance to the question of whether any error was prejudicial. When determining whether an erroneous argument caused prejudice, the focus is upon the likely effect that argument had upon the jury, not the length of time it took counsel to accomplish that effect.

Having determined that the *per diem* argument presented by counsel in the instant case constituted error, we must determine

whether the error requires reversal. The plaintiff directs our attention to *American National Bank & Trust Co. v. Peoples Gas Light & Coke Co.*, 42 Ill. App. 2d 163, 184, 191 N.E.2d 628 (1963). In that case, the plaintiff's counsel, asked the jury whether it " '[w]ould *** say $10 a day is fair compensation per day' " for the time the plaintiff spent in the hospital. This court found that, although error, the comment did not require reversal because it did not "remotely resemble the meticulous, comprehensive *'per diem'* argument used in Caley" and also noted that the jury awarded the plaintiff considerably less than the total damage award her counsel had requested. *American National Bank & Trust Co.*, 42 Ill. App. 2d at 185.

We note that the court employed similar reasoning in *Johnson v. Chicago Transit Authority*, 11 Ill. App. 3d 16, 19, 295 N.E.2d 573 (1973), a case not cited by the plaintiff.[2] In that case, the plaintiff's counsel suggested that a certain sum be awarded per year for a given number of years as damages for pain and suffering. It is unclear whether the trial court concluded that the argument did not constitute error or merely that it did not constitute prejudicial error. The court, however, found that the argument "did not go as far as the argument in *Caley*" and noted that counsel did not give undue emphasis to the argument, admonishing the jury that the figures he provided were merely suggestions and that the argument in question "was merely part of his entire argument for damages." *Johnson*, 11 Ill. App. 3d at 19.

In determining whether an argument is prejudicial, we must consider its likely effect upon the jury, not solely the length of time it took counsel to accomplish that effect. Therefore, the fact that the plaintiff's *per diem* argument in the instant case occupied little more than 1 page in an overall argument of 32 pages is not dispositive of the question of prejudice. We do, however, agree with the courts in *American National Bank* and *Johnson* that the comprehensiveness of an erroneous *per diem* argument, the emphasis placed upon the argument, and admonishments by counsel or by the trial court that the figures provided therein represent only suggestions are factors that may affect the impact of the argument upon the jury and, therefore,

---

[2]We find it unnecessary to discuss a number of other Illinois cases, not cited by the plaintiff, in which *Caley* arguments have been rejected. See *Friedland v. Allis Chalmers Co.*, 159 Ill. App. 3d 1, 8, 511 N.E.2d 1199 (1987); *Warp v. Whitmore*, 123 Ill. App. 2d 157, 164, 260 N.E.2d 45 (1970); *Turner v. Chicago Transit Authority*, 122 Ill. App. 3d 419, 430, 461 N.E.2d 551 (1984); *Fortner v. McDermott*, 1 Ill. App. 3d 358, 368, 272 N.E.2d 503 (1971). In each of these cases, unlike the situation here, no objection was raised at the time the argument in question was made.

pertain to the question of whether the improper argument mandates reversal.

The courts in *American National Bank* and *Johnson* concluded that the arguments presented therein were less comprehensive than that involved in *Caley*. We cannot reach that conclusion here. The plaintiff's counsel suggested to the jury that it award her $10 per hour or $100 per day and that it "multiply that times every day and \*\*\* run that through for four and a half years." Counsel concluded his discussion of damages for pain and suffering by stating: "I would suggest to you a number of $145,000 for those four years that [the plaintiff] has had the pain in her knee." The only difference we find between this argument and that in *Caley* is that counsel in *Caley* actually performed accurate mathematical computations for the jury.

The court in *Johnson* also noted that counsel in that case did not place undue emphasis on the argument in question and admonished the jury that the figures he provided were merely suggestions. We cannot say that counsel here did not place undue emphasis on his *per diem* argument. Rather, it was the center of his argument as to damages for pain and suffering. As the plaintiff correctly notes, her counsel did admonish the jury that the figures he was providing were merely suggestions. We do not believe, however, that these admonishments rendered the improper argument harmless. Counsel for plaintiff concluded his *per diem* argument by stating: "I would suggest to you a number of $145,000, for those four years that [the plaintiff] has had the pain in her knee." The jury awarded damages of $143,300 for pain and suffering, which amounted to 61% of the entire damage award.

We do note, as mentioned above, that counsel's math was less than accurate. Closing arguments in the trial took place approximately five and one-half years after the plaintiff's fall. During closing arguments, counsel incorrectly informed the jury at one point that it had been four and one-half years since the plaintiff's injury and, at another point, that it had been four years. As noted, at the conclusion of the *per diem* argument, counsel suggested to the jury "a number of $145,000 for those four years." An award of $100 per day for a period of four years would total $146,000, not $145,000. The fact that counsel provided the jury with an inaccurate figure based on his *per diem* formula does not change our determination. The jury in this case awarded an amount very close to the figure requested at the conclusion of the *per diem* argument. This indicates to us a strong likelihood that it adopted the formula suggested by counsel as its method for calculating damages for pain and suffering and merely accepted counsel's inaccurate figure rather than performing the mathematical computations pursuant to that formula itself. For this reason, we can-

not say that the improper *per diem* argument did not prejudice the defendant.

Accordingly, for the reasons stated above, we find it necessary to reverse the trial court's judgment as to damages. We do not, however, believe it is necessary to order a new trial on all issues. We find that: (1) the evidence in this case amply supports the jury's finding of liability; (2) the question of damages is so distinct from the matter of liability that a new trial as to damages alone would not be unfair to the defendant; and (3) the record contains no evidence whatsoever that the jury reached a compromise verdict or that the improper *per diem* argument influenced its finding as to liability. See *Balestri v. Terminal Freight Cooperative Ass'n,* 76 Ill. 2d 451, 456, 394 N.E.2d 391 (1979). Accordingly, we find it appropriate to order a new trial as to damages only.

Our decision to reverse on the issue of damages renders it unnecessary for us to address the defendant's argument that the trial court erred in allowing Dr. Cinta's testimony that the type of fracture which the plaintiff suffered was likely to lead to arthritis. This evidence pertained only to the issue of damages and would not have affected the jury's determination with regard to liability.

The judgment of the circuit court is affirmed as to the issue of liability and reversed as to the issue of damages, and the cause is remanded for a new trial on the issue of damages only.

Affirmed in part and reversed in part; cause remanded.

HARTMAN, P.J., and SOUTH, J., concur.